Milton APPLEBAUM, Plaintiff Below, Appellant,

v.

AVAYA, INC., Jeffrey A. Harris, Franklin A. Thomas Henry B. Schacht, Daniel C. Stanzione, Mark Leslie, Donald K. Peterson, and Patricia F. Russo, Defendants Below, Appellees.

No. 375, 2002.

Supreme Court of Delaware.

Submitted: Sept. 25, 2002.

Decided: Nov. 20, 2002.

Ronald A. Brown, Jr., Esquire, and Paul A. Fioravanti, Jr. Esquire (argued), of Prickett Jones & Elliott, P.A., Wilmington, Delaware; Of Counsel: Arthur T. Susman, Esquire, of Susman & Watkins, Chicago, Illinois, for Appellants.

Jesse A. Finkelstein, Esquire (argued), Daniel A. Dreisbach, Esquire, Peter B. Ladig, Esquire, Richard P. Rollo, Esquire, Paul D. Brown, Esquire, and Zoe A. Forrester, Esquire, of Richards, Layton, & Finger, Wilmington, Delaware; Of Counsel: Paul J. DiMaio, Esquire, of Avaya, Inc., Basking Ridge, New Jersey, for Appellees.

Before VEASEY, Chief Justice, HOLLAND and STEELE, Justices.

VEASEY, Chief Justice.

In this appeal, we affirm the judgment of the Court of Chancery holding that a corporation could validly initiate a reverse stock split and selectively dispose of the fractional interests held by stockholders who no longer hold whole shares. The Vice Chancellor interpreted Section 155 of the Delaware General Corporation Law to permit the corporation, as part of a reverse/forward stock split, to treat its stockholders unequally by cashing out the stockholders who own only fractional interests while opting not to dispose of fractional interests of stockholders who will end up holding whole shares of stock as well as fractional interests. In the latter instance the fractional shares would be reconverted to whole shares in an accompanying forward stock split.

We hold that neither the language of Section 155 nor the principles guiding our interpretation of statutes dictate a prohibi-

tion against the disparate treatment of stockholders, for this purpose. We also hold that the corporation may dispose of those fractional interests pursuant to Section 155(1) by aggregating the fractional interests and selling them on behalf of the cashed-out stockholders where this method of disposition has a rational business purpose of saving needless transaction costs.

A further issue we address is whether, as an alternative method of compensation, the corporation may satisfy the "fair price" requirement of Section 155(2) by paying the stockholders an amount based on the average trading price of the corporation's stock. Here, the Vice Chancellor properly held that the trading price of actively-traded stock of a corporation, the stock of which is widely-held, will provide an adequate measure of fair value for the stockholders' fractional interests for purposes of a reverse stock split under Section 155.

### Facts

Avaya, Inc. is a Delaware corporation that designs and manages communications networks for business organizations and large non-profit agencies. The enterprise is a descendant of the industry standard-bearer, AT & T. Avaya was established as an independent company in October of 2000 when it was spun off from Lucent Technologies. Lucent itself is a spin-off of AT & T. Because its capital structure is the product of two spin-off transactions, the outstanding stock of Avaya is one of the most widely-held on the New York Stock Exchange. Over 3.3 million common stockholders own fewer than 90 shares of Avaya stock each.

Although a large number of stockholders hold a small stake in the corporation, Avaya incurs heavy expenses to maintain their accounts. Avaya spends almost $4 million per year to print and mail proxy statements and annual reports to each stockholder as well as to pay transfer agents and other miscellaneous fees. Stockholders who own their stock in street names cost Avaya an additional $3.4 million in similar administrative fees.

Since the cost of maintaining a stockholder's account is the same regardless of the number of shares held, Avaya could reduce its administrative burden, and thereby save money for its stockholders, by decreasing its stockholder base. In February of 2001, at the corporation's annual meeting, the Avaya board of directors presented the stockholders with a transaction designed to accomplish this result. The Avaya board asked the stockholders to grant the directors authorization to engage in one of three alternative transactions:

(1) a reverse 1–for–30 stock split followed immediately by a forward 30–for–1 stock split of the Common stock

(2) a reverse 1–for–40 stock split followed immediately by a forward 40–for–1 stock split of the Common stock

(3) a reverse 1–for–50 stock split followed immediately by a forward 50–for–1 stock split of the Common stock.

We refer in this opinion to all three of these alternative transactions as the "Proposed Transaction" or the "Reverse/Forward Split." Regardless of the particular ratio the board chooses, at some future date the Reverse Split will occur at 6:00 p.m., followed by a Forward Split one minute later. Once selected, the effective date of the Split will be posted on Avaya's website.

The transaction will cash out stockholders who own stock below the minimum number ultimately selected by the directors for the Reverse/Forward Split pursuant to those three alternative options.

Stockholders who do not hold the minimum number of shares necessary to survive the initial Reverse Split will be cashed out and receive payment for their resulting fractional interests (the "cashed-out stockholders" or "targeted stockholders"). Stockholders who own a sufficient amount of stock to survive the Reverse Split will not have their fractional interests cashed out. Once the Forward Split occurs, their fractional holdings will be converted back into whole shares of stock.

Avaya will compensate the cashed-out stockholders through one of two possible methods. Avaya may combine the fractional interests and sell them as whole shares on the open market. In the alternative, the corporation will pay the stockholders the value of their fractional interests based on the trading price of the stock averaged over a ten-day period preceding the Reverse Split. Stockholders who hold their Avaya stock in street names have been advised to contact their nominees to see that they receive the same consideration as stockholders who have their interests registered in their own names.[1]

To illustrate the Proposed Transaction through a hypothetical, assume Stockholder A owns fifteen shares of stock and Stockholder B owns forty-five shares of stock. If Avaya chooses to initiate a Reverse 1–for–30 Stock Split, Stockholder A will possess a fractional interest equivalent to one-half a share of stock. Stockholder B will hold one whole share of Avaya stock and a fractional interest equivalent to one-half a share. Using the provisions of Section 155(1) or (2) of the Delaware General Corporation Law,[2] Avaya would cash out Stockholder A since he no longer possesses a whole share of stock. Stockholder A would no longer be an Avaya stockholder. Stockholder B will remain a stockholder because Avaya will not cash out the fractional interest held by her. Stockholder B's fractional interest remains attached to a whole share of stock. When Avaya executes the accompanying Forward 30–for–1 Stock Split, Stockholder B's interest in one and one-half shares will be converted into

1. In the Proxy Statement the Board explains that "Avaya intends for the Reverse/Forward Split to treat shareholders holding Common Stock in street name through a nominee ... in the same manner as shareholders whose shares are registered in their names. Nominees will be instructed to effect the Reverse/Forward Split for their beneficial holders. However, nominees may have different procedures and shareholders holding shares in street name should contact their nominees."

2. 8 *Del. C.* § 155 provides:
 Fractions of shares. A corporation may, but shall not be required to, issue fractions of a share. If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or in bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share or an uncertificated fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon and to participate in any of the assets of the corporation in the event of liquidation. The board of directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing the full shares or uncertificated full shares before a specified date, or subject to the conditions that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions which the board of directors may impose.

forty-five shares of stock, the same amount that she held prior to the Transaction.

At the annual meeting, Avaya stockholders voted to authorize the board to proceed with any one of the three alternative transactions. Applebaum, a holder of twenty-seven shares of Avaya stock, filed an action in the Court of Chancery to enjoin the Reverse/Forward Split. Under any one of the three alternatives Applebaum would be cashed out because he holds less than thirty shares.

### Proceedings in the Court of Chancery

Applebaum asked the Court of Chancery to enjoin the Proposed Transaction, alleging that Avaya's treatment of fractional interests will not comport with the requirements set forward in Title 8, Section 155 of the Delaware Code. Applebaum argued that Section 155 does not permit Avaya to issue fractional shares to some stockholders but not to others in the same transaction. Even if Avaya could issue fractional shares selectively, Applebaum contended that the methods by which Avaya plans to cash-out the smaller stockholders do not comply with subsections (1) and (2) of Section 155.

After considering cross-motions for summary judgment, the Court of Chancery denied Applebaum's request for an injunction and held that the Reverse/Forward Split would comply with Section 155 and dispose of the cashed-out stockholders' interests in a fair and efficient manner.[3] Applebaum appeals the final judgment entered for the defendants. We affirm.

### Issues on Appeal

Applebaum claims the Court of Chancery erred by: (1) holding that Title 8, Section 155 permits Avaya to issue fractional shares to the surviving stockholders but not issue fractional shares to the cashed-out stockholders; (2) holding that Avaya can combine the fractional interests and sell them on the open market; (3) holding that Avaya can instruct nominees to participate in the Split even if a particular nominee holds a sufficient amount of stock on behalf of all of its beneficial holders to survive the Split; (4) granting summary judgment and holding that the payment of cash for fractional interests based on a ten-day average of the trading price of Avaya stock constitutes "fair value" under Section 155; and (5) holding that the meaning of "fair value" in Sections 155(2) is different from Section 262 and thus failing to value the fractional shares as proportionate interests in a going concern.

### Section 155 Does Not Prevent Avaya From Disposing of Fractional Interests Selectively

Applebaum questions the board's authority to treat stockholders differently by disposing of the fractional interests of some stockholders but not others. Applebaum contends that Avaya will issue fractional shares in violation of Section 155. According to this view of the transaction, during the one minute interval between the two stock splits the corporation will not issue fractional shares to stockholders who possess holdings below the minimum amount. Those stockholders will be cashed out. Stockholders who hold stock above the minimum amount, by contrast, will be issued fractional shares that will be reconverted in the Forward Split into the same number of whole shares owned by those stockholders before the Reverse Split.

Applebaum argues that Section 155 prevents Avaya from achieving this disparate result by providing that:

3. *Applebaum v. Avaya, Inc.*, 805 A.2d 209 (Del.Ch.2002).

A corporation may, but shall not be required to, issue fractions of a share. If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined. . . . [4]

Applebaum reads Section 155 to mean that Avaya can employ the cash-out methods provided in Section 155 only if the corporation "does not issue fractions of a share." [5]

 This Court reviews de novo the Court of Chancery's decision to grant Avaya's motion for summary judgment.[6] We need not reach the merits of Applebaum's interpretation of Section 155 because he has based his argument on the flawed assumption that Avaya will issue fractional shares. Since the Reverse/Forward Split is an integrated transaction, Avaya need not issue any fractional shares. The initial Reverse Split creates a combination of whole *shares* and fractional *interests*. Avaya will use either Section 155(1) or (2) to cash out the fractional interests of stockholders who no longer possess a whole share of stock. Fractional *interests* that are attached to whole *shares* will not be disposed of. Nor will they be represented by fractions of a share. Fractional shares are unnecessary because the surviving fractional interests will be reconverted into whole shares in the Forward Split.[7]

 Applebaum correctly notes that Avaya stockholders are not treated equally in the Proposed Transaction. The disparate treatment, however, does not arise by issuing fractional shares selectively. It occurs through the selective disposition of some fractional interests but not others. The provisions of Section 155 do not forbid this disparate treatment. While principles of equity permit this Court to intervene when technical compliance with a statute produces an unfair result,[8] equity and equality are not synonymous concepts in the Delaware General Corporation Law.[9] Moreover, this Court should not create a safeguard against stockholder inequality that does not appear in the statute.[10] Here there is no showing that Applebaum was treated inequitably. From all that appears on this record, the proposed transaction was designed in good faith to

4. 8 *Del. C.* § 155.

5. *Id.*

6. *Telxon Corp. v. Meyerson,* 802 A.2d 257, 261 (Del.2002).

7. Shares of stock are issued to provide a verifiable property interest for the residual claimants of the corporation. *See Kalageorgi v. Victor Kamkin, Inc.,* 750 A.2d 531, 538 (Del.Ch.1999) (stating that "Corporate securities are a species of property right") *aff'd,* 748 A.2d 913 (Del.2000). We do not believe Avaya must issue fractional shares to recognize a property interest that, by the terms of the transaction, will last only sixty seconds.

8. *See, e.g., Schnell v. Chris–Craft Indus.,* 285 A.2d 437, 439 (Del.1971).

9. *See Nixon v. Blackwell,* 626 A.2d 1366, 1376 (Del.1993) ("It is well established in our juris-prudence that stockholders need not always be treated equally for all purposes."); *see also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 957 (Del.1985); *Cheff v. Mathes,* 199 A.2d 548, 554–56 (Del.1964).

10. *See, e.g., Williams v. Geier,* 671 A.2d 1368, 1385 n. 36 (Del.1996) (noting "Directors and investors must be able to rely on the stability and absence of judicial interference with the State's statutory prescriptions"); *Nixon,* 626 A.2d at 1379–81 (absent legislation there should be no "special, judicially-created rules for minority investors"); *American Hardware Corp. v. Savage Arms. Corp.,* 136 A.2d 690, 693 (Del.1957) (rejecting argument based on an interpretation that would "import serious confusion and uncertainty into corporate procedure").

accomplish a rational business purpose—saving transaction costs.[11]

Our jurisprudence does not prevent Avaya from properly using Section 155 in a creative fashion that is designed to meet its needs as an on-going enterprise.[12] The subsections listed in Section 155 merely require the corporation to compensate its stockholders when it chooses not to recognize their fractional interests in the form of fractional shares.[13] Based upon this record, we conclude that Avaya is free to recognize the fractional interests of some stockholders but not others so long as the corporation follows the procedures set forth in Section 155.

### Avaya May Proceed with Any of Its Alternative Plans to Dispose of the Fractional Interests

The balance of Applebaum's appeal challenges the alternative methods by which Avaya proposes to dispose of the fractional interests. The Court of Chancery concluded that Avaya could proceed under Section 155(1) by aggregating the fractional interests and selling them on behalf of the cashed-out stockholders. The Court also held that Avaya could employ Section 155(2), which requires payment of the "fair value" of the fractional interests, by paying the cashed-out stockholders an amount based on the average trading price of Avaya stock. We agree with the decision of the Court of Chancery and address separately the issues based on each subsection of the statute.

### Section 155(1) Permits Avaya to Sell the Factional Interest on Behalf of the Stockholders

■ The stockholders have authorized Avaya to compensate the cashed-out stockholders by combining their fractional interests into whole shares and then selling them on the stockholders' behalf. Section 155(1) permits Avaya to "arrange for the disposition of fractional interests by those entitled thereto."[14]

Applebaum claims that Avaya cannot use Section 155(1) because the corporation will sell whole shares rather than "fractional interests." According to this rendition of the transaction, the fractional interests held by the targeted stockholders must be reconverted into whole shares in the Forward Split. Otherwise, their fractional interests will be diluted.[15] Avaya must reconvert the interests back to their initial value as whole shares in order to

11. *See Sinclair v. Levien,* 280 A.2d 717, 720 (Del.1971) (board action presumed valid if it "can be attributed to any rational business purpose"); *see also Williams,* 671 A.2d at 1377–78 (board action in recommending charter amendment for stockholder action covered by business judgment rule in the absence of rebuttal demonstrating violation of fiduciary duty).

12. *See Grimes v. Alteon Inc.,* 804 A.2d 256, 266 (Del.2002) (noting that corporations "should have the freedom to enter into new and different forms of transactions") (citations omitted).

13. *See* WARD, WELCH & TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 155.1 (4th ed.2002) (stating "a corporation may refuse to issue share fractions ... [but] If the corporation chooses to ignore share fractions, it must elect one of the three alternatives authorized by Section 155...").

14. 8 *Del. C.* § 155(1).

15. Applebaum provides the following example: "[I]f the Minimum Number is 30, a holder of 10 pre-split shares will have a fractional interest of ⅓ of a share upon consummation of the Reverse Split. One minute later, the whole shares with their attendant fractional shares are multiplied by 30 in the Forward Split. If the ⅓ share fractional interest is not also multiplied by 30 in the Forward Split, it would be reduced to ¹⁄₉₀th of a post-Forward Split share." Appellant's Br. at 23 n. 10.

sell the combined fractional interests. Thus, Avaya would be selling whole shares rather than fractional interests.

 Applebaum's argument incorrectly assumes that Avaya must issue fractions of a share in the Proposed Transaction. After the Reverse Split takes place, the stockholders holding shares below the minimum amount will be cashed out. The fractional interests will not be represented as shares and are therefore not involved in the Forward Split. Avaya will then aggregate the fractional interests and repackage them as whole shares which the corporation will sell on the open market. The statute does not mandate any set procedure by which the fractional interests must be disposed of so long as those interests are sold in a manner that secures the proportionate value of the cashed-out holdings.

Applebaum also contends that Avaya cannot sell the fractional interests on behalf of the cashed-out stockholders. If Avaya sells the interests for the stockholders, Applebaum argues that the corporation will not comply with Section 155(1) because the interests are not disposed of by "those entitled thereto." As the Vice Chancellor noted, Applebaum presents a strained reading of Section 155(1).[16] The Court of Chancery correctly reasoned that "In the eyes of equity, such sales would be 'by'" the stockholders.[17]

Applebaum's interpretation also ignores the corporation's responsibility under Section 155(1) to "arrange" for the disposition of fractional interests. Since fractional shares cannot be listed on the major stock exchanges,[18] the corporation must arrange for their aggregation in order to sell them.[19] Aggregation is normally performed by

affording to the stockholder an election to sell the fractional share or to purchase an additional fraction sufficient to make up a whole share. The elections are forwarded to a trust company or other agent of the corporation who matches up the purchases and sales and issues certificates for the whole shares or checks for payment of the fractional shares . . . ."[20]

The general practice requires the corporation to act as an intermediary to package the fractional interests into marketable shares. If the corporation were not permitted to do so, the fractional interests of the cashed-out stockholders would be dissipated through the transaction costs of finding other fractional holders with whom to combine and sell fractional interests in the market.[21]

### Avaya May Instruct Nominees to Execute the Proposed Transaction on Behalf of the Beneficial Owners

 To execute the Reverse/Forward Split, Avaya stated in its proxy statement that "Nominees will be instructed to effect the Reverse/Forward Split for their beneficial holders." Applebaum argues that nominees cannot be forced to elect to receive cash in exchange for the fractional interests held by their beneficial holders if the nominee's combined holdings for *all* of its beneficial holders exceeds the minimum

16. *Applebaum,* 805 A.2d at 218.

17. *Id.*

18. *See* DREXLER, BLACK & SPARKS, DELAWARE CORPORATION LAW AND PRACTICE, § 17.04 (2001).

19. BALOTTI & FINKELSTEIN, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 5.15 (2002).

20. *Id.*

21. *See Applebaum,* 805 A.2d at 218.

amount of stock necessary to survive the Reverse Split.

Applebaum misstates the responsibility of a corporation to stockholders who hold their interests through nominees and brokers. Nominees, as agents of the beneficial owners,[22] owe a duty to take the necessary steps to afford the true owners the opportunity to realize the benefits of the Proposed Transaction. The Court of Chancery properly held that the Reverse/Forward Split could operate at the level of the corporate ledger.[23] Avaya is not required to take any additional actions to effect the transaction for stockholders who own their stock through a nominee.[24] The beneficial stockholders are responsible for making proper arrangements with their agents.[25]

Applebaum also raises a disclosure issue related to the instructions for beneficial owners. The proxy statement informs stockholders that nominees "will be instructed to effect" the transaction. Applebaum argues that this statement is misleading because, as explained above, he contends that a nominee has the option either to effect the split or refrain from doing so if the aggregate amount of the beneficial holders' stock is sufficient to survive the Reverse Split. The proxy statement places the beneficial owners on notice that they must make arrangements with their nominees to receive payment

from the transaction.[26] The proxy statement is not misleading because it accurately states that the nominees must execute the transaction on behalf of the beneficial holders.

### The Ten–Day Trading Average by which Avaya Proposes to Compensate the Cashed–Out Stockholders Constitutes "Fair Value" under Section 155(2)

As an alternative to selling the fractional interests on behalf of the stockholders, Avaya may opt to pay the stockholders cash in an amount based on the trading price of Avaya stock averaged over a ten-day period preceding the Proposed Transaction. To do so, Avaya relies on Section 155(2), which provides that a corporation may "pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined." [27]

The corporation owes its cashed-out stockholders payment representing the "fair value" of their fractional interests. The cashed-out stockholders will receive fair value if Avaya compensates them with payment based on the price of Avaya stock averaged over a ten-day period preceding the Proposed Transaction. While market price is not employed in all valuation contexts,[28] our jurisprudence recognizes that

**22.** *See O'Malley v. Boris,* 742 A.2d 845, 849 (Del.1999).

**23.** *Applebaum,* 805 A.2d at 220.

**24.** *See Enstar Corp. v. Senouf,* 535 A.2d 1351, 1354 (Del.1987) ("The legal and practical effects of having one's stock registered in street name cannot be visited upon the issuer. The attendant risks are those of the stockholder ....").

**25.** *See, e.g., Enstar,* 535 A.2d at 1354 (stating that the holder of record must demand appraisal rights); *see also* 8 *Del. C.* § 219(c) ("The stock ledger shall be the only evidence

as to who are the stockholders entitled to examine the stock ledger, the list required by this section or the books of the corporation, or to vote in person or by proxy at any meeting of stockholders.").

**26.** *Applebaum,* 805 A.2d at 220–21.

**27.** 8 *Del. C.* § 155(2).

**28.** *See e.g.,* 8 *Del. C.* § 262(h) ("In determining ... fair value," in an appraisal proceeding, "the Court shall take into account all relevant factors."); *Smith v. Van Gorkom,* 488 A.2d 858, 876 (Del.1985) (holding that a deci-

in many circumstances a property interest is best valued by the amount a buyer will pay for it.[29] The Vice Chancellor correctly concluded that a well-informed, liquid trading market will provide a measure of fair value superior to any estimate the court could impose.[30]

Applebaum relies on two instances where the Court of Chancery intimated that a Section 155(2) valuation may be similar to a going concern valuation employed in an appraisal proceeding. In *Chalfin v. Hart Holdings Co.*,[31] the Court of Chancery rejected a market price offered by a majority stockholder because the stock was not traded in an active market. In *Metropolitan Life Ins. Co. v. Aramark Corp.*,[32] the Court of Chancery declined to apply a private company discount presented by a controlling stockholder seeking to squeeze out the minority stockholders. Neither case applies here.

■■■ The court cannot defer to market price as a measure of fair value if the stock has not been traded actively in a liquid market.[33] In *Chalfin*, for example, the Court of Chancery held that the controlling stockholder could not offer as "fair value" in a reverse stock split the same amount alleged to be the past trading value because the stock had not been publicly traded for "some time." [34] The "market price" offered by the controlling stockholder was based on stale information.[35] An active trading market did not exist to monitor the corporation's performance. Thus, a more thorough valuation would have been necessary.

Avaya stock, by contrast, is actively traded on the NYSE. The concerns noted in *Chalfin* are not pertinent to the Proposed Transaction because the market continues to digest information currently known about the company. The value of Avaya's stock is tested daily through the purchase and sale of the stock on the open market.

In a related argument, Applebaum contends that the trading price cannot represent fair value because the stock price is volatile, trading at a range of prices from $13.70 per share to $1.12 per share over

---

sion by the board of directors to approve a merger did not fall within the proper exercise of business judgment because the directors failed to consider the intrinsic worth of the corporation where the stock traded at a depressed market value).

**29.** *Cf.* 8 *Del. C.* § 262(b)(1) (denying appraisal rights for stock listed on a national securities exchange, interdealer quotation system by the National Association of Securities Dealers, Inc. or held of record by more than 2,000 holders); *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d 173, 182 (Del. 1986) (noting that an auction for the sale of a corporation is an appropriate method by which to secure the best price for the stockholders); *Baron v. Pressed Metals of America, Inc.,* 123 A.2d 848, 854 (Del.1956) (noting that the "best price" a corporation could hope to obtain for the sale of a corporate asset "was what someone would be willing to pay" for it).

**30.** *Applebaum,* 805 A.2d at 215–16.

**31.** *Chalfin v. Hart Holdings Co.,* 1990 WL 181958 (Del.Ch.).

**32.** *Metropolitan Life Ins. Co. v. Aramark Corp.,* 1998 Del. Ch. LEXIS 70 (Del.Ch.).

**33.** *Chalfin,* 1990 WL 181958 at *4–5 (Del. Ch.).

**34.** *Id.* at *1.

**35.** *See Seagraves v. Urstadt Prop. Co.,* 1996 WL 159626 (Del.Ch.) at *7 ("To be reliable, market price must be established in an active market."); *Cf. Gimbel v. Signal Companies, Inc.,* 316 A.2d 599, 615, (Del.Ch.1974) (holding that an expert valuation of oil and gas properties should have been updated to account for market fluctuations) *aff'd* 316 A.2d 619 (Del.1974).

the past year.[36] The volatility in trading does not necessarily mean that the market price is not an accurate indicator of fair value. Avaya stock is widely-held and actively traded in the market. The ten-day average has been recognized as a fair compromise that will hedge against the risk of fluctuation. Corporations often cash out fractional interests in an amount based on the average price over a given trading period.[37]

Applebaum also misunderstands the appropriate context for which a going-concern valuation may be necessary under Section 155(2). In both *Chalfin* and *Aramark*, the Court of Chancery recognized that a transaction employing Section 155 may warrant a searching inquiry of fair

value if a controlling stockholder initiates the transaction.[38] When a controlling stockholder presents a transaction that will free it from future dealings with the minority stockholders, opportunism becomes a concern.[39] Any shortfall imposed on the minority stockholders will result in a transfer of value to the controlling stockholder. The discount in value could be imposed deliberately[40] or could be the result of an information asymmetry where the controlling stockholder possesses material facts that are not known in the market.[41] Thus, a Section 155(2) inquiry may resemble a Section 262 valuation if the controlling stockholder will benefit from presenting a suspect measure of valuation, such as an out-dated trading price,[42] or a wrongfully imposed private company dis-

36. Appellant's Br. at 13.

37. *See* DREXLER et. al. *supra* n. 18 § 17.04 (2001) (stating "Merger agreements frequently provide for the payment of cash based on trading prices during an agreed period. While this technically may not key to an exact time when the persons entitled to fractions are determined ... it is thought to better reflect fair values.").

38. *Chalfin*, 1990 WL 181958 at *3 n. 3 (noting that market price might satisfy the fair value requirement under Section 155(2) but not "where the market price was set by the issuer company, acting as the primary (if not the sole) buyer"); *Aramark*, 1998 Del. Ch. LEXIS 70 at *8 (going concern valuation is necessary when the controlling stockholder is performing the "functional equivalent" of a squeeze-out merger).

39. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983), ("Given the absence of any attempt to structure this transaction on an arm's length basis, [the controlling stockholder] ... cannot escape the effects of the conflicts it faced ...").

40. *Chalfin*, 1990 WL 181958 at *3 n. 3. *Cf. Van Gorkom*, 488 A.2d at 877 (holding that merger price offered by CEO in a leveraged buyout could not be accepted as adequate without further investigation since the offer

only calculated the amount that would allow the CEO to perform the transaction); *Weinberger* 457 A.2d at 711 (holding that outside directors for subsidiary company could not rely solely on fairness report prepared by individuals associated with the parent corporation to determine a fair price for the subsidiary's stock in a squeeze-out merger).

41. *See, e.g., Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 248 (De.2001) (a fair value determination must be based on *"all* relevant factors" in a short-form merger because the transaction presented by the controlling stockholder may be "timed to take advantage of a depressed market, or a low point in the company's cyclical earnings, or to precede an anticipated positive development ...."). *See also* Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 36 (1995) (arguing that an appraisal valuation may be necessary in a squeeze-out context if "the minority does not have a choice and is being forced out, perhaps because of an anticipated increase in value that will only become visible after the transaction, [in which case] exclusion [of the minority stockholders] can easily become a basis for oppression of the minority").

42. *Chalfin*, 1990 WL 181958 at *3.

count.[43]

Although the Reverse/Forward Split will cash out smaller stockholders, the transaction will not allow the corporation to realize a gain at their expense. Unlike the more typical "freeze-out" context, the cashed-out Avaya stockholders may continue to share in the value of the enterprise. Avaya stockholders can avoid the effects of the proposed transaction either by purchasing a sufficient amount of stock to survive the initial Reverse Split or by simply using the payment provided under Section 155(2) to repurchase the same amount of Avaya stock that they held before the transaction.

The Reverse/Forward Split merely forces the stockholders to choose affirmatively to remain in the corporation. Avaya will succeed in saving administrative costs only if the board has assumed correctly that the stockholders who received a small interest in the corporation through the Lucent spin off would prefer to receive payment, free of transaction costs, rather than continue with the corporation. The Transaction is not structured to prevent the cashed-out stockholders from maintaining their stakes in the company. A payment based on market price is appropriate because it will permit the stockholders to reinvest in Avaya, should they wish to do so.

### The Meaning of "Fair Value" under Section 155(2) is not Identical to the Concept of "Fair Value" in Section 262

The Court of Chancery correctly interpreted "fair value" in Section 155 to have a meaning independent of the definition of "fair value" in Section 262 of the Delaware General Corporation Law.[44] Relying on the maxim that the same words used in different sections must be construed to have the same meaning,[45] Applebaum argues that "fair value" under Section 155(2) requires the court to perform a valuation similar to an appraisal proceeding. Borrowing from appraisal concepts that require that shares of stock be valued as proportionate interests in a going concern, Applebaum contends that the average trading price would be inadequate because the market price possesses an inherent discount that accounts for the holder's minority stake in the company.[46]

The Delaware General Assembly could not have intended Section 155(2) to have the same meaning as the fair value concept employed in Section 262.[47] The reference to fair value in Section 155 first appeared in 1967.[48] The General Assembly did not

---

43. *Aramark*, 1998 Del. Ch. LEXIS at *8.

44. 8 *Del. C.* § 262(a) (providing that "Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) ... who continuously holds such shares through the effective date of the merger or consolidation ... who has neither voted in favor of the merger or consolidation nor consented thereto ... shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock. ...").

45. *See* 2B SINGER, STATUTES AND STATUTORY CONSTRUCTION, § 51.02 (6th ed.2000).

46. *See Cavalier Oil, Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del.1989).

47. *Hariton v. Arco Electronics, Inc.*, 188 A.2d 123, 124 (Del.1963) ("[t]he general theory of the Delaware Corporation Law that action taken pursuant to the authority of the various sections of that law constitute acts of independent legal significance and their validity is not dependent on other sections of the Act.") (quoting *Langfelder v. Universal Laboratories*, 68 F.Supp. 209, 211 (D.Del.1946)).

48. 56 Del. Laws, ch. 50.

place the term fair value in Section 262 until 1976.[49] Furthermore, the case law developing the concept of fair value under the appraisal statute did not acquire its present form until this Court discarded the Delaware block method and underscored the necessity of valuing a corporation as a going concern.[50] This Court has not suggested similar valuation guidelines for the right to receive "fair value" under Section 155(2). Finally, Section 262(b)(2)(c) expressly excludes fractional interests from the appraisal remedy when the stock is traded on a national exchange. When applied in the context of a merger or consolidation, Applebaum's interpretation of "fair value" under Section 155(2) would accord the stockholder of a constituent corporation an appraisal of fractional interests to which the stockholder is not entitled under the "market out" exception provided in Section 262.[51]

■ As this Court noted in *Alabama By–Products v. Cede & Co.*, the right to an appraisal is a narrow statutory right that seeks to redress the loss of the stockholder's ability under the common law to stop a merger.[52] The Reverse/Forward Split permitted under Section 155 does not present the same problem and is ill-suited for the same solution provided for in Section 262.

■ The valuation of a stockholder's interest as a "going concern" is necessary only when the board's proposal will alter the nature of the corporation through a merger. When a corporation merges with another corporation, the dissenting stockholder is entitled to the value of the company as a going concern because the nature of the corporation's future "concern" will be vastly different.[53] In a merger requiring an appraisal, the dissenting stockholder's share must be measured as a proportionate interest in a going concern because the proponents of the merger will realize the full intrinsic worth of the company rather than simply the market price of the stock. Thus, when a minority stockholder is confronted with a freeze-out merger, the Section 262 appraisal process will prevent the proponents of the merger from "reaping a windfall" by placing the full value of the company as a going concern into the merged entity while compensating the dissenting stockholder with discounted consideration.[54]

49. 60 Del. Laws, ch. 371.

50. *See Weinberger,* 457 A.2d at 703.

51. Section 262(b)(1) denies appraisal rights to stockholders of a merging corporation if their stock is listed on a national securities exchange, interdealer quotation system, or held of record by more than 2,000 holders. 8 *Del. C.* § 262(b)(1). Similarly, under Section 262(b)(2)(c), those same stockholders are not afforded an appraisal right for cash they receive "in lieu of fractional shares" of the stock. 8 *Del. C.* § 262(b)(2)(c).

52. 657 A.2d 254, 258 (Del.1995); *see also* WARD et. al. *supra* n. 13 § 262.1 ("Delaware recognizes the stockholders' appraisal right only in the case of a merger or consolidation."); *see also Glassman,* 777 A.2d at 247 (discussing short-form mergers authorized by Title 8, Section 253 of the Delaware Code and

noting that appraisal is the appropriate remedy for the inability to block the transaction).

53. *See Paskill Corp. v. Alcoma Corp.,* 747 A.2d 549, 553 (Del.2000) (discussing a recent analysis that justifies appraisal rights as a method by which proponents of a merger are forced to internalize the net benefits and costs of engaging in a "risk altering transaction") (quoting Peter V. Letsou, *The Role of Appraisal in Corporate Law,* 39 B.C. L.Rev. 1121, 1123–24 (1998)).

54. *See Cavalier Oil,* 564 A.2d at 1145 ("[T]o fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholder who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.").

Avaya will not capture its full going-concern value in the Reverse/Forward Split. As the Vice Chancellor noted, if the cashed-out stockholders were awarded the value of the company as a going concern, they, rather than the corporation, would receive a windfall. The cashed-out stockholders could capture the full proportionate value of the fractional interest, return to the market and buy the reissued stock at the market price, and realize the going concern value a second time should Avaya ever merge or otherwise become subject to a change of control transaction.[55]

### Conclusion

The judgment of the Court of Chancery is affirmed.

---

55. *Applebaum,* 805 A.2d at 217.