Ginette REIS, Plaintiff,

v.

HAZELETT STRIP–CASTING CORPORATION, Stave Island Limited Partnership, R. William Hazelett, David N. Hazelett, Raymond J. Clavelle, Jr., Craig Snyder and Richard T. Hayden, Defendants.

C.A. No. 3552–VCL.

Court of Chancery of Delaware.

Submitted: Oct. 25, 2010.
Decided: Jan. 21, 2011.
Corrected: Feb. 1, 2011.

---

Ronald A. Brown, Jr., Marcus E. Montejo, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Plaintiff.

James S. Green, Kevin A. Guerke, Jared T. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Attorneys for Defendants.

## *OPINION*

LASTER, Vice Chancellor.

The controller of Hazelett Strip–Casting Corporation cashed out the minority shares held by the estate of his deceased brother via a reverse stock split. The plaintiff sued on behalf of the beneficiaries of the estate who would have received shares but for the reverse split. I hold that the reverse split was not entirely fair and award damages of $1,268,850, plus pre- and post-judgment interest, less an offset for amounts already paid.

## I. FACTUAL BACKGROUND

These are the facts as found after a two-day trial.

### A. Hazelett Strip–Casting Corporation

In 1929, C.W. Hazelett designed and operated the first commercial continuous casting and processing line in the world. In 1949, he invented the twin-belt caster. In 1956, his sons William Hazelett ("Bill") and S. Richard Hazelett ("Dick") formed Hazelett Strip–Casting to capitalize on

their father's inventions.[1]

Located in Colchester, Vermont, Hazelett Strip–Casting manufactures casting machines for the production of aluminum, zinc, lead, and copper strip and related products. A strip-casting machine is a major capital investment costing up to $16 million. Once in service, a strip-casting machine has a useful life of twenty to thirty years. Hazelett Strip–Casting sells between zero and four machines per year. The bulk of the company's stable and recurring revenues come from servicing existing machines and selling spare parts.

Hazelett Strip–Casting has always been a family business. From 1956 until December 27, 1994, Bill and Dick were Hazelett Strip–Casting's only stockholders. Bill owned 800 shares, giving him 69.57% of the equity. Dick owned 350 shares, giving him 30.43%. The brothers did not have a voting agreement, and the corporation's governing documents lacked any supermajority requirements or other provisions that would limit Bill's control as majority stockholder. Dick wrote in his Last Will and Testament dated December 5, 2001, that

I permitted Bill to acquire a majority ownership interest … without understanding that minority stockholders have in practice almost no legal rights against a majority unless the Corporation were sold. The so-called fiduciary obligation of the majority is inherently too vague to be effective except in around one percent of actual cases. I was late in learning that corporation law, unlike partnership law, is designed to favor unitary control. Nevertheless, the outcome is not entirely unreasonable. Given my brother's temperament, he need-

ed leeway, freedom, and he still needs it. I credit Bill for guiding our corporation to success and for finally allowing me to share in that success to a limited extent.

JX1 at 6.

On December 27, 1994, Bill formed Stave Island Limited Partnership for estate planning purposes and contributed his 800 shares to Stave Island. Bill controlled Stave Island through a two-thirds general partner interest. Bill's wife, Dawn Hazelett, held the remaining one-third general partner interest. A majority of the limited partner interests were held by an irrevocable trust in Bill's name. The other limited partner interests were held by Bill's children and their spouses. By letter dated June 27, 2006, Bill resigned as managing general partner and transferred his general partner interest to Dawn.

At the time of the decisions relating to the reverse split, Hazelett Strip–Casting's board of directors consisted of Bill, his son David N. Hazelett ("David"), and company employees Raymond J. Clavelle, Jr., Craig Snyder and Richard T. Hayden. Bill served as Chairman, President, and Chief Executive Officer, having held these positions from the founding of the company until he passed away during the pendency of this case.[2] David served as the company's Executive Vice President, having worked in various positions for the company since 1987. Clavelle was the company's General Manager, having worked for the company since 1977. Hayden was the company's Manufacturing Manager, having worked for the company since 1985. Snyder was the company's Engineering Manager, having worked for the company since 2002.

---

1. The parties have used the Hazelett family members' first names. I adopt the practice for clarity and without intending familiarity or disrespect.

2. Bill died on June 27, 2010. He was 91 years old. The parties have not made any arguments based on his passing. No suggestion of death was filed.

Dick died on July 23, 2002. In his will, he bequeathed his 350 shares to 169 individuals, consisting primarily of past and present company employees. The five defendants were bequeathed a total of 20 shares. Plaintiff Ginette Reis received two shares. She spent her career providing cleaning services to the company. Janet Patterson received two shares. She had worked as Dick's librarian. Dick's will named Reis and Patterson as executors for his estate (the "Estate"). The will was probated before the Probate Court in and for Chittendon County, Vermont (the "Probate Court").

### B. Bill And David Respond To The Bequests.

Bill and David did not relish the prospect of Dick's shares being distributed to 169 individuals. They cited assorted specific objections, including the notion that Hazelett Strip–Casting would "lose [its] close corporation status" under Delaware law, which they understood to mean that "there would be additional reporting and notice requirements." Trial Tr. (David) 84; *see* JX26 at 1 ("HSCC would lose its 'close corporation' status under Delaware corporate law, requiring expensive large corporation procedures to be followed."). Their belief was heartfelt, but incorrect. Hazelett Strip–Casting never opted to qualify as a close corporation, which requires specific provisions in a corporation's charter. *See* 8 *Del. C.* § 342. Nor was Hazelett Strip–Casting an S-Corporation, which would have limited the number of stockholders it could have. *See* 26 U.S.C. §§ 1361–79 (2011). Hazelett Strip–Casting was simply a closely held corporation in the generic sense, and the distribution of Dick's shares would not have changed anything about its governance.

The defendants also worried that Key-Bank N.A., Hazelett Strip–Casting's primary lender, would balk at 169 new stockholders. Bill and Dick had pledged their shares to secure Hazelett Strip–Casting's loans, and the defendants did not believe KeyBank would accept 169 additional individual pledges. Trial Tr. (David) 65. This was a rational concern, but it turned out KeyBank was willing to work with the legatees.

The defendants also professed fear that shares would end up in the hands of disgruntled former employees of the company. At a probate hearing in February 2005, two such individuals asserted that they were entitled to shares under the will. The defendants testified that the individuals had sued or threatened to sue the company. The defendants thought that if the individuals obtained shares, they would interfere with the management of the business and "[t]he very 'being' of HSCC and its ability to continue as an ongoing business would be jeopardized." JX26 at 1. In assessing the magnitude of this threat, the defendants appear to have overestimated the rights available to minority stockholders and underestimated the authority of the board of directors under Section 141(a) of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 141(a).

Having reviewed the record, heard the living defendants testify, and read Bill's deposition, I believe that Bill and David deeply disliked the idea of their family-owned company suddenly being opened up to outsiders. What ultimately drove the company's response to the threatened distribution of Dick's shares was their conception of Hazelett Strip–Casting as the family business that Bill co-founded, built, and wanted to pass on intact to his children, without 169 co-owners. The other directors, all senior company employees, understandably channeled Bill and David's sentiments.

## C. Bill And David Try To Buy The Estate's Shares.

On October 25, 2004, Hazelett Strip–Casting offered to purchase the Estate's 350 shares for $1,500 per share. Bill set the price unilaterally. When questioned about the price in his deposition, Bill said he "just pulled it out of the air." The defendants characterize this remark as sarcasm from a self-made nonagenarian who ran out of patience with the deposition process. The fact remains that Bill set the price without input from anyone else or any valuation analysis. The record contains ample evidence that Bill was a self-confident and sometimes headstrong individual who was the dominant force at his company. Although Bill did not phrase his answer optimally for litigation defense, his candid response fell close to the mark.

David communicated Bill's figure to Reis and Patterson. In his letter, David described the $1,500 price as "more than twice the $715 per share amount provided for in the old Stock Purchase Agreement." JX2 at 2. That agreement was executed in 1981 and entitled the Estate to put its shares to the company at that price. It did not give the company a call. Adjusted for inflation, the $715 price equated to $1,485.85 in 2004 dollars, without affording any value to the growth and success of the company over the intervening 23 years.

David also observed that the price was "$571.43 per share higher than the $928.57 per share amount of the [2003] Gallagher Flynn valuation." JX2 at 2. The Estate obtained that valuation for estate tax purposes, where a low valuation is desirable. Bill recognized that a higher valuation "would only have raised the value of Dick's estate above his IRS exemptions and would have obligated the estate to pay high estate taxes.... The only one to gain would have been the IRS." JX7 at 3. The defendants have not relied on the Gallagher Flynn report as evidence of the fair value of the shares.

David closed his letter by stating that if the Estate declined the offer and the shares were distributed, the company might "offer to purchase shares from individual legatees" but that it was "likely that if such offers are made they would be at not more than ... $990 per share." JX2 at 3.

Reis and Patterson initially were enthusiastic about the prospect of getting cash for the Estate's beneficiaries, and in January 2005 they filed a motion asking the Probate Court for permission to sell the shares. After thinking the matter over further, Reis and Patterson hesitated. Reis became concerned that the offer undervalued the company.

Worried about a possible change of heart, Bill spoke with Reis. David listened to Bill's side of the call. According to David's contemporaneous notes, Bill

> spoke to her about our company and how similar machine shops have gone out of business. He spoke of how we might be prohibited from making big bonuses if we had outside stockholders and how the outside stockholders might object if employees got big bonuses and they didn't get dividends, etc.

> He went on to talk a bit about how he supported Dick financially over the years.

> I think one or the other irritated the other and the phone call ended somewhat abruptly.

JX4 at 1.

Bill next communicated directly with the employees. He made several arguments in favor of the $1,500 offer, including:

- "Realistically, no dividends will be paid in the foreseeable future."

● "The Hazelett family owns 70% of the stock. The family will always have this controlling interest.... The Hazelett family's intention is never to sell the company."

● "Our [$1,500 per share] offer is fair and tax free to you. *We are not in a position to increase this offer.* If you trust the Hazelett family to be fair with you, it is the only chance we will *ever* have to control all of the stock and continue the Hazelett family's tradition to operate as we have for 48 years."

JX7 at 3–4.

On August 5, 2005, Bill sweetened the offer to (i) $1,500 per share in 2005 plus (ii) another $1,500 in 2010, if the company had the ability to pay the additional amount at that time (a vague and subjective standard that was not further defined). If the company failed to make the second payment, the beneficiaries would get their shares back, but keep the initial $1,500 payment. Discounting the 2010 payment back to 2005 at 21%, the rate endorsed by the defendants' expert, Bill's offer had a present value of $2,078.32 (more if a lower discount rate were used).

## D. The Reverse Split

While the executrices were resisting the stock sale and seeming to hold out for a higher price, *the Estate's attorney* suggested to the company's probate counsel that a reverse stock split could be used to bypass the executrices and achieve the same result as a purchase. At first, Bill rejected the idea, fearing that his employees might view it as heavy-handed. Once there appeared to be no other alternative, Bill decided to go ahead.

On October 25, 2005, the directors acted by unanimous consent to approve a reverse split and recommend it to the stockholders. In the reverse split, every outstanding share would become a 1/400 fractional interest. After the split, the Estate would hold 350/400 of a share, and Stave Island would hold two shares. The board did not set a value that the Estate would receive. It resolved that Hazelett Strip–Casting would "arrange for the disposition of the fractional interest that will be held by the Estate" or "pay in cash the fair value of such fraction of a share," and "such arrangement for disposition shall be made, or such fair value shall be paid, promptly following the corporation's receipt of a stock valuation study." JX12 at 2.

On November 29, 2005, the reverse split was presented at a special meeting of stockholders. The only stockholder present was Stave Island, which voted to approve the reverse split. On December 13, 2005, the board met and voted to amend Hazelett Strip–Casting's certificate of incorporation to add Article Thirteenth, which provided "The Corporation shall not issue or permit to be outstanding fractions of a share." JX15. The charter amendment did not otherwise implement the reverse split. It was filed with the Delaware Secretary of State on December 23, 2005. With this filing, the defendants incorrectly believed that they had completed the reverse split.

## E. The SMK Valuation

To determine the value the Estate would receive, the board retained Sheldrick, McGehee & Kohler, LLC ("SMK"), a valuation firm based in Florida. On February 20, 2006, four months after the board approved the reverse split, three months after the stockholders approved it, and two months after the defendants believed it was consummated, SMK provided its valuation. SMK opined that, as of September 30, 2005, the aggregate equity of Hazelett Strip–Casting was worth $1,834,443, mak-

ing each 1/400 fractional interest worth $1,595.17. On March 20, 2006, the board approved a cash payment of $558,309.50 to compensate the Estate for its 350/400 of a share.

Reis and Patterson refused to accept the check on behalf of the Estate. They disagreed with SMK's valuation and did not want to prejudice their ability to challenge the payment. Hazelett Strip–Casting and the Estate's lawyer then asked the Probate Court to remove them as the executors of the Estate. By order dated May 16, 2006, the Probate Court removed Reis and Patterson, and appointed a local attorney, Albert A. Cicchetti, as administrator. He accepted the check on behalf of the Estate and deposited it in an interest-bearing account while reserving the right to contest the adequacy of the amount.

### F. Reis Challenges The Reverse Split.

Despite being removed from her position as executor, Reis continued to challenge the reverse split. On January 11, 2008, the Probate Court conducted a hearing to review the Administrator's Final Summary of Account and Proposed Decree of Distribution. In connection with that hearing, Reis argued (correctly) that the reverse split never had been consummated because Hazelett Strip–Casting's charter was not properly amended through a filing with the Delaware Secretary of State that memorialized the recapitalization.

In an effort to moot this objection, the board acted via unanimous consent dated January 15, 2008, to approve a further amendment to the company's charter that actually would implement the reverse split. A meeting of stockholders to consider the amendment took place on January 25, 2008. Cicchetti, the administrator appointed by the Probate Court, objected to the reverse split as "unfair to the minority" and voted against the amendment.

JX28 at 1; JX30 at 1. Stave Island voted in favor, so the amendment passed. The charter amendment was filed on January 28, 2008, finally implementing the reverse split as of that date. No further valuation work took place, and the board did not consider, much less set, an updated price.

Meanwhile, on January 24, 2008, the Probate Court entered an Order Regarding Final Summary of Account and Proposed Decree of Distribution. The Probate Court concluded that it did "not have jurisdiction to rule on the validity of the Corporation's recapitalization plan, and that transaction ha[d] not been challenged in any court of competent jurisdiction." JX28 at 2. Noting that "[s]ufficient concern ha[d] been raised about the appraised value of the Decedent's shares [based on the February 2006 appraisal] to merit further consideration," the Probate Court authorized the Estate to obtain a new appraisal of the shares, but ruled that the order could be "overridden ... if more than 50% of the beneficiaries object." Id. at 3. In fact, 106 of the 169 beneficiaries objected. The Probate Court then entered a final decree approving distributions from the Estate.

Reis appealed the decree. She also filed this action, in which she challenged the reverse split as a breach of the defendants' fiduciary duties and as violating Section 155(2) of the DGCL. After additional procedural jousting, the parties stipulated to dismiss the appeal and proceed with litigation in this Court.

On September 26, 2008, the plaintiff moved for partial summary judgment as to the effective date of the reverse split. Vice Chancellor Lamb granted the motion, holding that the reverse split was effective on January 28, 2008, the date the certificate of amendment was filed, and that the company would be valued as of that date for purposes of this proceeding.

On December 2, 2009, the defendants moved for summary judgment as to Reis's claims for breach of fiduciary duty, arguing that their actions were protected by the business judgment rule and that the plaintiff should be relegated to a statutory claim for "fair value" under Section 155(2). As discussed below, the Delaware Supreme Court held in *Applebaum v. Avaya, Inc.*, 812 A.2d 880 (Del.2002), that Section 155(2) does not authorize an appraisal-style proceeding to obtain "fair value" for fractional shares. Clothing the reverse split in the protections of the business judgment rule would therefore have foreclosed the plaintiff from obtaining any remedy. I denied the motion and ruled for reasons reiterated below that the controller and conflicted directors who approved the freeze-out would have the burden at trial to prove that the transaction was entirely fair. Because the defendants would bear the burden of proof, I allowed them to present their case in chief first and to offer a rebuttal case after the plaintiff rested. The parties tried the case on July 21 and 22, 2010.

## II. LEGAL ANALYSIS

■ Sections 242 and 155 of the DGCL authorize a corporation to effect a reverse split via charter amendment. Section 242 provides that a corporation may amend its certificate of incorporation to "subdivid[e] or combin[e] the outstanding shares of any class . . . of shares into a greater or lesser number of outstanding shares." 8 *Del. C.* § 242(a)(3). Section 155 provides that "[a] corporation may, but shall not be required to, issue fractions of a share." 8 *Del. C.* § 155.

If it does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when

those entitled to receive such fractions are determined or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or in bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share.

*Id.* By statute, if a corporation effects a transaction that results in fractional interests *and* opts to compensate stockholders in lieu of issuing fractional shares, then the corporation must pay "in cash" an amount equal to the "fair value" of the fractional interests "as of the time when those entitled to receive such fractions are determined." *Id.*

## A. Judicial Review Of A Section 155(2) "Fair Value" Determination

The term "fair value" appears in both Section 155(2) and in Delaware's appraisal statute, 8 *Del. C.* § 262. Section 262 authorizes a specialized proceeding in the Court of Chancery through which stockholders may obtain a judicial determination of the fair value of their shares after a merger. Section 262 spells out when and how to make an appraisal demand, establishes a timeline for filing an appraisal petition, and specifies the corporate obligations triggered by the filing. *See* 8 *Del. C.* § 262(d) & (e). Substantively, Section 262 allocates the task of determining "fair value" to the Court of Chancery. Section 262(a) states that a qualifying stockholder "shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock." Section 262(h) provides that "the Court shall determine the fair value of the shares."

■ Because the appraisal statute allocates the valuation determination in the first instance to the Court of Chancery, the resulting proceeding differs from tra-

ditional litigation in which wrongdoing has been alleged. A stockholder need not plead or prove any wrongdoing to obtain the fair value determination. *Andra v. Blount*, 772 A.2d 183, 192 n. 22 (Del.Ch. 2000) (noting that stockholder seeking appraisal "is entitled, without having to prove wrongdoing or liability on anyone's part, to a determination of the fair value of his investment" (quoting Jack B. Jacobs, Reappraising Appraisal: Some Judicial Reflections, Speech at 15th Annual Ray Garrett Jr. Corporate and Securities Law Institute, Northwestern University School of Law (Apr. 27, 1995), at 12)). Indeed, "allegations attacking the manner in which the merger was effectuated ... should be stricken [from an appraisal petition] pursuant to Chancery Court Rule 12(f)." *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 1994 WL 198726, at *3 (Del.Ch. May 16, 1994).[3] Unlike in an action where wrongdoing has been alleged, "[i]n a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G.*

*Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del.1999). "No presumption, favorable or unfavorable, attaches to either side's valuation, including the actual merger price." *Pinson v. Campbell–Taggart, Inc.*, 1989 WL 17438, at *6 (Del.Ch. Feb. 28, 1989). If both sides fail to meet the preponderance standard, the court must make its own valuation determination.[4]

▮▮▮ Section 155(2) does not contain anything remotely similar to the mechanisms found in Section 262, and it therefore does not authorize an appraisal-style proceeding to obtain "fair value" for fractional shares. *See Applebaum*, 812 A.2d at 893. Section 155(2) provides instead that if a corporation opts to buy out fractional interests, the corporation "shall ... pay in cash the fair value" of those interests. 8 *Del. C.* § 155(2). Responsibility for determining fair value is allocated to the corporation. Under Section 141(a) of the DGCL, the authority to make that determination rests with the board. As in other contexts, a stockholder who seeks to chal-

---

**3.** This does not mean that evidence of unfairness is irrelevant to an appraisal proceeding. To the contrary, such evidence goes to the credibility of witnesses and the reliability of the data that underlie the valuation process. *See, e.g., Ala. By–Prods. Corp. v. Neal*, 588 A.2d 255, 257 (Del.1991) (noting that acts of unfair dealing and breaches of fiduciary duty "should, and will, be considered in assessing the credibility of the respondent corporations' valuation contentions" (internal quotation marks omitted)); *In re Chang's Hldgs. v. Universal Chems. & Coatings, Inc.*, 1992 WL 301327, at *1 (Del.Ch. Oct. 13, 1992) ("[I]nformation concerning directors' breach of fiduciary duty may be relevant to an appraisal valuation [because] expert valuations are based on assumptions, and many of those assumptions are derived from information provided by a company's board."). Discovery in an appraisal proceeding may provide the only route to uncover information necessary to pursue a claim for fraud or breach of fiduciary duty. *See Cede & Co. v. Technicolor,*

*Inc.*, 542 A.2d 1182, 1189 (Del.1988) [hereinafter *Technicolor Appraisal*].

**4.** *See Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 52 (Del.Ch.2007) (determining fair value after finding that "neither party fully satisfied its burden of persuasion regarding a valuation"); *Pinson*, 1989 WL 17438, at *6 ("[The] conventional approach [to litigation with a burden of proof] is of limited utility in an *appraisal*, because § 262 mandates that the Court 'shall appraise' (i.e., shall independently determine) the fair value of the dissenting stockholders' shares."); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del.Ch. June 8, 1993) ("When, as here, none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis."); *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *20 (Del. Ch. Feb. 22, 1988) ("[Section] 262 requires that, where possible, the Court independently determine that valuation component, even where the parties themselves have tried and failed."), *aff'd*, 564 A.2d 1137 (Del.1989).

lenge the board's decision must plead and subsequently prove that the board acted wrongfully. A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties.[5]

Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness. The business judgment rule is the default standard of review. It presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). "[W]here the business judgment [rule] presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del.2006) (internal quotation marks omitted).

Enhanced scrutiny is Delaware's intermediate standard of review. Framed generally, it requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del.Ch. 2007).

Enhanced scrutiny applies when the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors. The ur-case involves resistance to a hostile takeover, where there is an "omnipresent specter" that target directors may be influenced by and act to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985). Tailored for this context, enhanced scrutiny requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." *Id.* at 955.

Directors facing a proxy context have a similar positional conflict. "A candidate for office, whether as an elected official or as a director of a corporation, is likely to prefer to be elected rather than defeated. He therefore has a personal interest in the outcome of the election even if the interest is not financial and he seeks to serve from the best of motives." *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1206 (Del.Ch.1987). Enhanced scrutiny also applies in other situations where the law provides stockholders with a right to vote and the directors take action that intrudes on the space allotted for stockholder decision-making. *See Mercier*, 929 A.2d at 804–10 (discussing application of enhanced scrutiny to board action affecting stockholder voting); *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *10–11 (Del.Ch. Dec. 4, 2000) (applying

---

**5.** *See Sample v. Morgan*, 914 A.2d 647, 672 (Del.Ch.2007) (explaining that decisions by fiduciaries under Delaware law are " 'twice-tested'—once by the law and again by equity"). *See generally* Adolphe A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L.Rev. 1049, 1049 (1931) ("[I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.").

enhanced scrutiny to meeting adjournment that kept polls open for vote on increasing shares allocated to stock option plan).

Final stage transactions for stockholders provide another situation where enhanced scrutiny applies.[6] Final stage transactions give rise to what economists refer to as the last period problem. "Simply put, in a situation where parties expect to have repeated transactions, the recognition that a party who cheats in one transaction will be penalized by the other party in subsequent transactions reduces the incentive to cheat. However, when a transaction is the last (or only) in a series—that is, the final period— the incentive to cheat reappears because, by definition, the penalty for doing so has disappeared." Ronald J. Gilson & Bernard S. Black, *The Law and Finance of Corporate Acquisitions* 720 (2d ed.1995). *See generally* Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 Fordham L.Rev. 1899, 1942–53 (2003) (describing divergence of interests resulting from last period problem).

In the corporate context, the ability of managers to shirk or self-deal ordinarily is constrained not only by legal duties but also by a range of markets, including the product markets, capital markets, employment markets, and the market for corporate control. But when managers are in their final period, market consequences have less traction, making managers more likely to favor their own interests. In connection with a final stage transaction,

the target corporation's board and management may demand side payments from the acquiror, thus effectively diverting a portion of the merger consideration from the shareholders to the management team. If the management team is able to protect the self-serving transaction with deal protection provisions, it will be further insulated from the disciplinary effect of the market for corporate control, leaving the outgoing management team free to serve their own self-interest with relative impunity.

In addition to the unrestrained pursuit of their own self-interest, directors and managers in the last period may depart from the best interests of the corporation and its shareholders due to a variety of non-pecuniary, but equally selfish, motivations. Directors and managers may favor one deal over another because it is more in line with their self image and view of the world or because

**6.** *See McMullin v. Beran*, 765 A.2d 910, 918 (Del.2000) ("Whenever the board is deciding whether to approve a proposed 'all shares' tender offer that is to be followed by a cash-out merger, the decision constitutes a final-stage transaction for all shareholders. Consequently, the time frame for the board's analysis is immediate value maximization for all shareholders." (internal footnotes omitted)); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del.1986) ("The Revlon board's authorization permitting management to negotiate a merger or buyout with a third party was a recognition that the company was for sale. The duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. This significantly altered the board's responsibilities under the *Unocal* [en-

hanced scrutiny] standards. . . . The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company."); *Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1019 (Del.Ch.2010) ("In a final stage transaction—be it a cash sale, a breakup, or a transaction like a change of control that fundamentally alters ownership rights— there are sufficient dangers to merit employing enhanced scrutiny. . . ."); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del.Ch.1994) (Allen, C.) ("[*I* ]f the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization.").

it is more likely to cause them to be remembered fondly by employees or the business press.

Griffith, *supra*, at 1947 (internal footnotes omitted).

■ Fiduciaries need not consciously pursue self-interest. "[T]he last period signals a time when otherwise common behavioral biases may lead to serious deviations from the welfare of the corporation and its shareholders." *Id.* at 1948; *see id.* at 1949–53 (discussing overconfidence, over-optimism, groupthink, reactive devaluation, and in-group/out-group thinking). The human psyche has a powerful ability "to rationalize as right that which is merely personally beneficial." *City Capital Associates. v. Interco Inc.*, 551 A.2d 787, 796 (Del.Ch.1988) (Allen, C.); *see eBay Domestic Hldgs., Inc. v. Newmark*, 2010 WL 3516473, at *20 (Del.Ch. Sept. 9, 2010) ("Human judgment can be clouded by subtle influences like the prestige and perquisites of board membership, personal relationships with management, or animosity towards a bidder."). In recognition that potentially subtle conflicts can affect director decision-making, enhanced scrutiny places the burden on the defendant fiduciaries who approved the final stage transaction to show that they acted reasonably to obtain for their beneficiaries the best value reasonably available under the circumstances. *See Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 48–49 (Del.1994). Enhanced scrutiny likewise extends to defensive measures that have the potential to insulate last period decision-making from market forces or undermine the ability of stockholders to reject the transaction.[7]

■ Entire fairness is Delaware's most onerous standard. When a party challenging a board's decision alleges and later proves facts sufficient to overcome the business judgment rule, "the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders." *Walt Disney*, 906 A.2d at 52. Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del.1995) (internal quotation marks omitted) [hereinafter *Technicolor Plenary* ]. "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del.Ch.2006).

■ A reverse split in which stockholders receive cash in lieu of fractional interests is an end stage transaction for those stockholders being cashed out of the enterprise. A disinterested and independent board's decision to pay cash in lieu of fractional shares therefore should be subject to enhanced scrutiny. As the Delaware Supreme Court explained in *Applebaum*, admittedly without placing its holding explicitly within an enhanced scrutiny framework, it is reasonable for a board to use market value to determine the price paid for fractional interests

7. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 934 (Del.2003); *Paramount Commc'ns, Inc. v. Time, Inc.*, 571 A.2d 1140, 1151 (Del.1989); *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 106 (Del.Ch.1999); Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures in Stock–for–Stock Merger Agreements*, 56 Bus. Law. 919, 939–40 & n. 66 (2001); Mark Lebovitch & Peter B. Morrison, *Calling a Duck a Duck: Determining the Validity of Deal Protection Provisions in Merger of Equals Transactions*, 2001 Colum. Bus. L.Rev. 1, 8 (2001).

when there is no controlling stockholder and the stock is widely traded. *See* 812 A.2d at 891–92 (finding disinterested and independent board majority complied with Section 155(2) by determining fair value using ten-day moving average; company had no controlling stockholder and its shares were traded widely on the New York Stock Exchange). In other circumstances, exclusive reliance on the market price to determine fair value for purposes of Section 155(2) might not be reasonable.

> One may concede the possibility that market price may equate to fair value [for purposes of Section 155(2)] in a given case. However, that proposition is hardly axiomatic or universally valid. Indeed, the invalidity of [that] position is particularly apparent where, as here, the market price may have been depressed by the absence of any active trading and where the market price was set by the issuer company, acting as the primary (if not the sole) buyer.

*Chalfin v. Hart Hldgs. Co., Inc.,* 1990 WL 181958, at *3 n. 3 (Del.Ch. Nov. 20, 1990) (finding that complaint challenging 100:1 reverse split was meritorious when filed for purpose of awarding attorneys' fees).

 When a controlling stockholder uses a reverse split to freeze out minority stockholders without any procedural protections, the transaction will be reviewed for entire fairness with the burden of proof on the defendant fiduciaries. *See Metro. Life Ins. Co. v. Aramark Corp.,* 1998 WL

34302067, at *3 (Del.Ch. Feb. 5, 1998) (TRANSCRIPT). *See generally Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994). A reverse split under those circumstances is the "functional equivalent" of a cash-out merger. *Metro. Life,* 1998 WL 34302067, at *3. If the controlling stockholder permits the board to form a duly empowered and properly functioning special committee, or if the transaction is conditioned on a correctly formulated majority-of-the-minority vote, then the burden could shift to the plaintiff to prove that the transaction was unfair. *See In re Cox Commc'ns, Inc. S'holders Litig.,* 879 A.2d 604, 644 (Del.Ch.2005). If the controlling stockholder permits the use of both protective devices, then the transaction could avoid entire fairness review. *See In re CNX Gas Corp. S'holders Litig.,* 4 A.3d 397, 400 (Del.Ch.2010); *In re John Q. Hammons Hotels Inc. S'holder Litig.,* 2009 WL 3165613, at *12 (Del.Ch. Oct. 2, 2009); *Cox Commc'ns,* 879 A.2d at 606.

 In this case, Bill controlled Hazelett Strip–Casting. In 2005, he directly controlled Stave Island, which was the company's controlling stockholder with nearly 70% of its outstanding common stock. By the time of the 2008 re-do, Bill had transferred control over Stave Island to his wife. Her interests were presumptively aligned with Bill's, and there was no evidence presented at trial to the contrary.[8] Both in 2005 and in 2008, Bill held

---

8. *See, e.g., Harbor Fin. P'rs v. Huizenga,* 751 A.2d 879, 889 (Del.Ch.1999) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable." (internal footnote omitted)); *Chaffin v.*

*GNI Gp.,* 1999 WL 721569, at *5 (Del.Ch. Sept. 3, 1999) (holding father-son relationship was sufficient to rebut presumption of independence; "Inherent in the parental relationship is the parent's natural desire to help his or her child succeed.... [M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way."); *see also London v. Tyrrell,* 2010 WL 877528, at

the positions of Chairman, President, and CEO. The other four directors were beholden to him. Each was an employee of Hazelett Strip–Casting, and David was both an employee and Bill's son. Although each director testified at trial that he was independent, I do not credit that testimony. The natural pulls of the directors' affiliations were too strong, and at no point did any of them actually act independently of Bill. No protective devices were used. Without adding new directors to the board, an independent committee could not have been appointed, and there was no majority-of-the-minority vote. Accordingly, the reverse split was subject to review for entire fairness with the burden of proof on the defendants.

## B. The Applicable Valuation Standard

In *Applebaum*, the Delaware Supreme Court opined that " 'fair value' in Section 155[has] a meaning independent of the definition of 'fair value' in Section 262 of the Delaware General Corporation Law." 812 A.2d at 892. This holding creates an interpretive conundrum when a reverse split must be reviewed for entire fairness, because the "fair price" aspect of the unitary entire fairness standard is widely regarded as requiring a valuation analysis equivalent to the "fair value" inquiry in an appraisal. Respected scholars have equated the terms.[9] In the one Court of Chancery ruling to address the valuation standard for a controlling stockholder freeze-out implemented through a reverse split, the Court held that the defendants had a duty "to pay stockholders who are cashed out the fair value of their stock as that term is defined in the appraisal cases and in the breach of fiduciary duty cases in merger transactions." *Metro. Life,* 1998 WL 34302067, at *3.

Delaware Supreme Court authority confirms that the fair price and fair value standards call for equivalent economic inquiries. The Delaware Supreme Court first considered the standard for determining value in an appraisal in *Tri–Continental v. Battye*, 74 A.2d 71 (Del.1950). Adopting the standard enunciated in *Chicago Corp. v. Munds*, 172 A. 452 (Del.Ch. 1934), the Supreme Court held that

> [t]he basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By

*14 n. 60 (Del.Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then ... it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

9. *See, e.g.,* Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts,* 50 B.C. L.Rev. 1021, 1029–31 (2009) ("[I]t is generally accepted in the Delaware case law and the major treatises on Delaware corporate law that in evaluating the 'entire fairness' of a squeeze-out merger, the courts generally uti-

lize the same valuation analysis for both the fair price prong of the fiduciary duty action and the appraisal action." (internal quotation marks omitted)) [hereinafter, *Rationalizing Standards* ]; Guhan Subramanian, *Fixing Freezeouts,* 115 Yale L.J. 2, 43–44 (2005) ("As a starting point, courts in entire fairness proceedings generally look to the appraisal remedy. . . ."); John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions,* 147 U. Pa. L.Rev. 1251, 1260–62 (1999) ("In entire fairness cases, corporate fiduciaries are required to show that the terms of a proposed conflict transaction include a 'fair price,' and Delaware courts look to appraisal cases for guidance in deciding whether a given price is fair, even when a merger does not trigger appraisal rights.").

value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value. 74 A.2d at 72.

Two years after *Tri–Continental,* the Delaware Supreme Court issued its opinion in *Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107 (Del.1952), the seminal decision applying the entire fairness standard to a parent-subsidiary merger. In describing the fair price inquiry, the Court relied on *Tri–Continental* and framed the test in identical terms. Thus, the proper "test of fairness" was whether "the minority stockholder shall receive the substantial equivalent in value of what he had before." *Id.* at 114; *accord id.* at 110 (inquiring "whether ... the Mayflower minority stockholder will receive the substantial equivalent in value of the shares he held before the merger"); *see Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 940 (Del.1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling,* 93 A.2d at 114)). The *Sterling*

Court cited *Tri–Continental* and other appraisal cases for the propositions that the minority was entitled to the value of its interest as a "going concern" and that the Court was required consider "all relevant factors." *Sterling,* 93 A.2d at 114 (citing, in addition to *Tri–Continental, Root v. York Corp.,* 29 Del.Ch. 351, 50 A.2d 52 (1946), and *Munds* ).

*Sterling* implicitly equated the economic inquiry in an entire fairness case and an appraisal proceeding. In *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983), the Delaware Supreme Court made the identity explicit. The decision involved an entire fairness challenge to a freeze-out merger and provided the definitive formulation of the entire fairness test:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness. However, in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger.

*Id.* at 711 (internal citations omitted).[10]

In support of its description of fair price, the *Weinberger* Court cited both

---

**10.** Numerous decisions recite this now-canon-ical formulation. *E.g., Emerald P'rs v. Berlin,*

*Tri–Continental* and the Delaware appraisal statute. 457 A.2d at 711. Later, when explaining that "[f]air price obviously requires consideration of all relevant factors involving the value of a company," the Supreme Court noted that "[t]his has long been the law of Delaware" and quoted extensively from *Tri–Continental.* 457 A.2d at 713. The *Weinberger* Court further described the fair price inquiry as "thoroughly consonant with the purpose and intent of our statutory law" and quoted from the appraisal statute. 457 A.2d at 713; *accord Bershad,* 535 A.2d at 845 (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 *Del. C.* § 262").

Perhaps most significantly for the relationship between fair price and fair value, *Weinberger* distinguished between *the valuation standard* to be applied in the fairness inquiry—which is identical—and *the potential remedy* available—which could be quite different.

> While a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy . . . may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. . . . Under such circumstances, the Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages.

457 A.2d at 714.

Subsequent Delaware Supreme Court decisions have stressed the different remedies available in an entire fairness case and an appraisal proceeding: "[A] statutory appraisal proceeding under section 262 and a rescissory suit for fraud, misrepresentation, self-dealing and other actionable wrongs violative of 'entire fairness' to minority shareholders serve different purposes and are designed to provide different, and not interchangeable remedies." *Technicolor Appraisal,* 542 A.2d at 1187 (internal footnote omitted).

> [I]n a section 262 appraisal action the only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares. In contrast, a fraud action asserting fair dealing and fair price claims affords an expansive remedy and is brought against the alleged wrongdoers to provide whatever relief the facts of a particular case may require.

*Id.; see also Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1106 (Del. 1985) (describing complaint that alleged breaches of duty of loyalty in freeze-out merger as raising "issues which an appraisal cannot address").

■ Given that the Delaware Supreme Court has long equated the fair price and

---

787 A.2d 85, 97 (Del.2001) (quoting *Weinberger*); *Kahn v. Lynch Commc'n Sys., Inc.,* 669 A.2d 79, 82 (Del.1995) (same); *Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 845–46 (Del.1987) (same); *In re TD Banknorth,* 938 A.2d 654, 667 n. 33 (Del.Ch.2007) (same); *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 391 n. 25 (Del.Ch.1999) (same); *Van de Walle v. Unimation, Inc.,* 1991 WL 29303, at *9 (Del.Ch. Mar. 7, 1991) (same); *Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 504 (Del.Ch.1990) (same); *Smith v. Shell Petroleum, Inc.,* 1990 WL 84218, at * 12 (Del.Ch. June 19, 1990) (same).

fair value inquiries, I do not believe that *Applebaum* changed the rules for Section 155(2) cases. The policies that animate using a fair value standard to evaluate freeze-outs call for its use when the freeze-out is implemented by a reverse split.

[P]arties have an interest in a legal rule that encourages some individuals or entities to become controllers, while protecting the interests of the minority shareholders. This means that controllers can continue to exercise the rights of control, which, in the context of the appraisal and merger statutes, means allowing them to engage in squeeze-out mergers. It also means protecting minority shareholders so that they are willing to invest in companies with controllers. In cash-out mergers, the rule must ensure that the minority shareholders are not made worse off by the transaction.

But minority shareholders also need controlling shareholders and would be worse off if the legal rules made it unprofitable for controlling shareholders to serve in that capacity. The controlling shareholders of the world are non-diversified shareholders who take on unsystematic, company-specific risk by being incompletely diversified. They do so in return for the benefits of exercising control. The obvious benefit of having controlling shareholders is that agency costs are reduced because the interests of the controller are more aligned with the corporation. Minority shares can be a very profitable investment for shareholders who essentially ride the coattails of the non-diversified, and hence focused, controlling shareholder. With the correct balance achieved, the controlling shareholder can exercise its rights of control, restricted only by a constraint that it pay fair value when it acquires minority shares without their holders' consent, or, in other words, that

its actions not make the minority shareholders worse off.

*Rationalizing Standards, supra,* at 1032–33 (internal footnotes omitted). The going concern value rule "provides the minority shareholders with the value of what was taken from them" and incentivizes controllers to engage in transactions only when they do not make the minority stockholders worse off. *See* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law,* 31 J. Corp. L. 119, 139 (2005) [hereinafter, *Fair Value of Cornfields*]. The fair value standard is therefore economically efficient and should be applied consistently to freeze-outs, regardless of form.

## C. Whether The Reverse Split Was Entirely Fair

■ "The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger,* 457 A.2d at 711. I now apply the *Weinberger* standard.

### 1. Fair Dealing

■ There was no dealing in this case that could be called "fair." Procedural protections were not implemented, and no one bargained for the minority. Reis and Patterson, who were acting as fiduciaries for the Estate, were not given the chance. When they hesitated to accept the price that Bill set unilaterally and expressed concerns about whether it was fair, *the Estate's counsel* suggested that the company bypass them. The defendants had not previously considered implementing a freeze-out unilaterally. To the extent the executors might have wanted to bargain with Bill, their lawyer undercut their position. Otherwise Reis and Patterson might have obtained a higher price. Despite Bill's claim that his initial $1,500 per share offer was the most the company would

ever pay, in August 2005 he made a materially higher offer when Reis and Patterson began to waver.

Further undermining the fairness of the process were Bill and David's communications with Reis, Patterson, and the other legatees. Bill and David made threats to the effect that the minority would never receive any dividends, that Hazelett Strip–Casting would never pay a higher price, that the Hazelett family would never sell its shares, and that if the Estate did not accept the company's $1,500 per share offer, the company might consider offering selected minority stockholders the far lesser price of approximately $990 per share. Threats of this nature by a controller are evidence of unfairness. *See, e.g., Lynch Commc'n Sys.,* 638 A.2d at 1120–21 (finding controller's threat that rejecting offer would lead to hostile transaction at lower price showed there was no "semblance of arm's length bargaining"); *Kahn v. Dairy Mart Convenience Stores, Inc.,* 1996 WL 159628, at *8 (Del.Ch. Mar. 29, 1996) (considering controller's "threat to veto any competing transaction" and its concomitant disabling effect on negotiations as "evidence of unfair dealing").

### 2. Fair Price

Having failed to implement a fair process, the defendants did not serendipitously arrive at a fair price. Technically, the defendants did not set any price. When they actually implemented the reverse split in January 2008, they did not make any effort to determine the "fair value" of the fractional interest "as of the time when those entitled to receive such fractions are determined." 8 *Del. C.* § 155(2). They rather left in place the price that SMK concluded in February 2006 was the value of Hazelett Strip–Casting as of September 30, 2005. As of that date, SMK valued the company's equity at $1,834,443, based on which Hazelett Strip–Casting paid $1,595.17 per fractional interest.

To carry their burden to prove fairness at trial, the defendants introduced a second report from SMK dated April 28, 2009, prepared for purposes of litigation, valuing Hazelett Strip–Casting as of January 28, 2008. The later opinion concluded that, as of January 28, 2008, the equity of Hazelett Strip–Casting was worth $1,745,000, or $1,517.39 per fractional interest. In the aggregate, this was $89,443 *less* than the 2005 valuation. Jess W. Wright, Senior Vice President of SMK, was a principal author of both reports and testified at trial.

The plaintiff responded with a report from Willamette Management Associates ("WMA") dated July 15, 2009, likewise prepared for litigation, that valued the equity of Hazelett Strip–Casting as of January 28, 2008, at $6,312,000, or $5,489 per fractional interest. Timothy J. Meinhart, the author of the WMA report, testified at trial.

As a matter of pure legal theory, my task at this stage of the proceeding is to determine whether the defendants have proven that the decision to leave in place the 2005 valuation resulted in a price that fell within a range of fairness. The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation. The entire fairness test seeks to determine whether directors complied with their fiduciary duties. "A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *Emerald P'rs,* 787 A.2d at 93; *see also Nixon v. Blackwell,* 626 A.2d 1366, 1376 (Del.1993) ("Application of the entire fairness rule does not, however, always implicate liability of the conflicted corporate decisionmaker, nor does it necessarily render the decision void."). "[P]erfection is not possible,

or expected as a condition precedent to a judicial determination of entire fairness." *Technicolor Plenary*, 663 A.2d at 1179 (internal quotation marks omitted).

 "The value of a corporation is not a point on a line, but a range of reasonable values...." *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del.Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del.2005). When conducting a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del.Ch. 1994) (Allen, C.), *aff'd, Technicolor Plenary*, 663 A.2d 1156; *accord Kahn v. Tremont Corp.*, 1996 WL 145452, at *1 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *rev'd on other grounds*, 694 A.2d 422 (Del.1997). A court readily could conclude that a price fell within the range of fairness and would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price. *Compare Technicolor Plenary*, 663 A.2d at 1176–77 (affirming that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 30 (Del.2005) (awarding fair value in appraisal of $28.41 per share).

 In an entire fairness case, the matter only proceeds to the remedial phase if the transaction fails the test of fairness. At that point, the remedy could well be a damages award equal to the fair value that would have been awarded in an appraisal, but "the measure of any recoverable loss ... under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del.1993). "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del.1996). "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del.2000). "The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del.Ch. Sept. 29, 1992) (Allen, C.). "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del.Ch. Oct. 29, 1993).

 One consequence of the remedial breadth afforded by a plenary breach of fiduciary action is that "the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Gesoff*, 902 A.2d at 1154. The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transac-

tions.[11] This possibility answers a question that some have posed about what a minority stockholder could be entitled to except a fair price. *See* Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L.Rev. 785, 798 n. 41 (2003) ("Suppose the price is entirely fair, but the process is faulty. To what else are shareholders entitled beyond a fair price?"). Depending on the facts and the nature of the loyalty breach, the answer can be a "fairer" price. *See HMG/Courtland*, 749 A.2d at 116–17 (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage.").

■ The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections.[12] A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price. *See Tremont*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Bomarko, Inc. v. Int'l Telecharge Inc.*, 794 A.2d 1161, 1183 (Del.Ch.1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 766 A.2d 437 (Del.2000) [hereinafter, *Bomarko II* ].

Factors such as coercion, overreaching, the misuse of confidential information, or secret conflicts (a list that is explicitly non-exclusive) could lead a court to award a monetary remedy in an entire fairness action that differs from what appraisal would generate. The monetary remedies should

11. *See, e.g., HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 122–23 (Del.Ch.1999) (awarding remedy in which damages portion was designed to replicate terms corporation would have obtained if unconflicted fiduciary had negotiated on its behalf, where fiduciary with undisclosed buy-side conflict negotiated a price that fell barely within range of fairness); *Boyer v. Wilm. Materials, Inc.*, 754 A.2d 881, 908 (Del.Ch.1999) (granting damages meant to approximate what would have been paid "had there been full disclosure of the [defendants'] interest and arm's length bargaining among the parties"; reasoning that "our law's strong policy of discouraging acts of disloyalty ... require[s] the imposition of some penalty to remedy the [defendants'] act of disloyalty"); *see generally* 1 *Principles of Corporate Governance: Analysis & Recommendations*, Part V. Duty of Fair Dealing Introductory Note at (d) (1994) ("[F]airness is often a range, rather than a point, so that a transaction involving a payment by the corporation may be fair even though it is consummated at the high end of the range. If an undisclosed material fact had been disclosed, however, the corporation might have declined to transact at that high price, or might have bargained the price down lower in the range.").

12. *See, e.g., M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del.1999) ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del.Ch. Mar. 6, 1991) ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller ... was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available. The fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair.").

differ inherently if the court awards rescissory damages in the plenary action, because rescissory damages are not calculated as of the merger date (like the award in an appraisal) but rather generally reflect the value of the wrongfully taken property at the time of judgment, *see Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501–03 (Del.1981), *overruled on other grounds*, *Weinberger*, 457 A.2d at 703–04, or the highest intervening value between the time of the wrong and the time of judgment if the beneficiary or a faithful fiduciary could have disposed of wrongfully taken property at the higher intervening price, *see Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023–24 (Del.2001); *Paradee v. Paradee*, 2010 WL 3959604, at *13–14 (Del.Ch. Oct. 5, 2010).

■ This case does not call for a remedy other than an award of fair value. I am convinced that the defendants did not set out to extract value rapaciously from the minority, nor did they freeze out the minority to capture the value of opportunities that the corporation was on the verge of achieving and in which the minority otherwise would have shared. This does not mean that they acted disinterestedly. The Hazelett family's majority interest placed them in a direct economic conflict with the minority, making the freeze-out an obviously self-interested transaction for them. The other insider directors were loyal employees who had cast their lot with the Hazelett family and were beholden to Bill and David.

When it is productive to review fair price initially as a range and then construct a remedy, this Court has done so.[13] In cases like this one, where the fair price analysis and remedial determination coincide, this Court has prudently declined to review fair price twice, first as a range for purposes of the entire fairness standard and later as a point figure for purposes of the remedial calculation.[14] Our decisions instead follow the salutary and efficient practice of analyzing the issue once by "conduct[ing] the same essential inquiry as in an appraisal, albeit with more leeway to consider fairness as a range and to consider the remedial objectives of equity." *PNB Hldg.*, 2006 WL 2403999, at *22; *accord Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *8–9 (Del.Ch. Aug. 19, 2005).

## D. The Fair Value Of The Shares

In determining the fair value of the shares, I rely on two methods: capitalized earnings and book value. I reject the

---

13. *E.g., Gesoff*, 902 A.2d at 1154–64 (Del.Ch. 2006) (finding first that $10.50 per share was not a fair price, then valuing the company to calculate damages at $14.30 per share); *Bomarko II*, 794 A.2d at 1182–90 (finding that $0.30 per share was not a fair price, then valuing the company to calculate damages at $1.51 per share).

14. *See, e.g., In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *1 (Del.Ch. Aug. 18, 2006) ("I conclude that the fair value of a share of PNB on the date of the Merger was $52.34, which is $11.34 per share higher than the consideration offered in the Merger. Therefore, ... the [plaintiffs who brought entire fairness claims] will receive $11.34—the damages resulting from the unfair Merger.");

*Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342–44 (Del.Ch.2006) (finding company's per-share value, then using that "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority ... as a matter of equity," and granting the same amount as damages); *In re Emerging Commc'ns, Inc. Shareholders Litigation*, 2004 WL 1305745, at *24 (Del.Ch. May 3, 2004) (finding that "fair value" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting the difference as damages).

plaintiff's comparable companies and capitalized free cash flow methods.

### 1. Capitalized Earnings

Both SMK valuations employed a single methodology: capitalized earnings. In the abstract, this is an indisputably valid method. *See, e.g., Gonsalves v. Straight Arrow Publishers, Inc.,* 701 A.2d 357, 360–62 (Del.1997). The approach boasts a considerable Delaware pedigree as one of the methodologies comprising the Delaware Block Method. Both SMK valuations, however, exhibit flaws which enabled SMK to reach an unfair result conveniently close to the $1,500 price that Bill unilaterally set in October 2004 for the initial buy-out offer to the Estate. I will use the SMK trial valuation as a starting point and make significant corrections.

 The capitalized earnings method "requires two basic inputs: a measure of the company's earnings and a capitalization rate." *Gonsalves v. Straight Arrow Publishers, Inc.,* 793 A.2d 312, 319 (Del. Ch.1998), *aff'd in part, rev'd in part on other grounds,* 725 A.2d 442 (Del.1999) (TABLE) [hereinafter, *Gonsalves II* ]. Reliable earnings projections should be used when available.

> [It is] intrinsically more appealing to rely on the future prospects of a company, where reliable projections are available, than the historical earnings of the company because the theoretically more correct measure of the entity's value, under an earnings valuation approach, is the present value of its future cash flows or earnings.

*In re Radiology Assocs., Inc. Litig.,* 611 A.2d 485, 497–98 (Del.Ch.1991). If reliable projections are not available, then the Court should look to historical earnings to provide the best available insight into the company's future earnings potential. The record is devoid of projections for Hazelett Strip–Casting. Both experts looked to historical results, as will I.

When using historical results to develop a projection of future performance, Delaware courts have preferred to calculate an average across a multi-year period. This practice is designed to obtain a representative projection by smoothing out variations and balancing extraordinary gains or losses.[15] Under the Delaware Block Method, our courts adopted a five-year period as the norm.[16] Delaware courts would use a shorter period "only in the most unusual situations." *Tannetics,* 1979 WL 2700, at *6. Post-*Weinberger,* Delaware law does not mandate a five-year earnings period, and a court may use one year of results, a two- or three-year average, a longer period, or a weighted average to determine the earnings base. *See Gonsalves,* 701 A.2d at

---

**15.** *See, e.g., Tannetics, Inc. v. A.J. Indus., Inc.,* 1979 WL 2700, at *7 (Del.Ch. July 17, 1979) (explaining that the purpose behind the practice of averaging earnings over a multi-year period is "to balance any changes or extraordinary profits and/or losses"); *In re Creole Petroleum Corp.,* 1978 WL 2487, at *3 (Del. Ch. Jan. 11, 1978) ("By taking an average of several years, the impact of unusual profits and losses in different years can be reduced."); *Gibbons v. Schenley Indus., Inc.,* 339 A.2d 460, 469 (Del.Ch.1975) ("[A]veraging earnings over [a multiyear] period ... [is] a means of minimizing the impact of untypical profits and losses.").

**16.** *E.g., Universal City Studios, Inc. v. Francis I. duPont & Co.,* 334 A.2d 216, 218 (Del.1975) ("The five-year average is reasonable and supported by the established law of this State."); *In re Del. Racing Ass'n,* 213 A.2d 203, 212 (Del.1965) ("Average earnings over the five-year period immediately preceding the merger have ordinarily been used as the basis for determining earnings value."); *Tannetics,* 1979 WL 2700, at *6 ("[T]he customary period of time over which to compute such average is ordinarily fixed at the five-year period immediately preceding the merger.").

361–62; *cf. Harris v. Rapid–Am. Corp.*, 1990 WL 146488, at \*9 (Del.Ch. Oct. 2, 1990) (finding six-year average provides "an [i]ndisputably sufficient period of time" to minimize year-to-year disparities), *aff'd in part, rev'd in part on other grounds*, 603 A.2d 796 (Del.1992).

■■■ The earnings figures used to derive the earnings base should be adjusted to eliminate non-recurring gains and losses.[17] SMK failed to make any normalizing adjustments. Meinhart made normalizing adjustments, but not all were consistent with Delaware law.

First, Meinhart added back research and development ("R & D") expense of $825,000 in the fiscal year ended March 31, 2007, and $574,000 in the nine months ended December 31, 2007. Meinhart opined that the industry average for R & D was 5% of revenue. From 2003 to 2006, Hazelett Strip–Casting's R & D expenses hovered around this level. In 2007, however, Hazelett Strip–Casting changed its accounting practices to re-allocate the costs of a number of frequently idle employees from "cost of goods sold" to R & D. As a result, between 2006 and 2007 R & D expenditures approximately doubled. According to Meinhart, his reduction was appropriate because (i) a rational buyer of Hazelett Strip–Casting would invest less in R & D, and (ii) the sudden increase in R & D should produce greater future income, such that backing out the higher R & D expense would provide one way to account for the future income.

David testified that Hazelett Strip–Casting has "a general company policy of trying to retain [its] work force and not lay people off when things are down. Instead, [Hazelett Strip–Casting] put[s] more effort into R & D to try to be ready for the next time [it] get[s] some machine orders." Trial Tr. (David) 25–26. Management regards retaining employees as critical to the long-term success of the company. *See id.* Put differently, management believes that retaining employees generates greater returns over the long run than a marginal bump in near-term cash flow that might be achieved from a layoff.

Hazelett Strip–Casting's business strategy of retaining employees represents the operative reality of the enterprise. *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del.1999) ("[T]he corporation must be valued as a going concern based upon the 'operative reality' of the company....."). The company's hiring and retention policies are issues where the controller's interests align with the minority's. Both want to maximize the value of the firm. How a company treats its line employees is not a self-interested transaction that the controller could use to divert returns that otherwise would inure proportionately to all equity holders.

■■■ The R & D adjustment that Meinhart advocates "normally would be made only in the case of a controlling interest valuation, unless there was reason to believe that the changes were imminent and probable." Pratt, *supra*, at 132. It

17. *See Gonsalves II*, 793 A.2d at 325 (noting that expenses "properly viewed as non-recurring" may be "excluded from earnings as elements not reflective of [the corporation's] value as a going concern"), *aff'd in relevant part*, 725 A.2d 442, 1999 WL 87280, at \*3 (Del. Jan. 5, 1999) (TABLE); *Gibbons*, 339 A.2d at 470 (excluding one-time extraordinary sale "of a major branch of [the] business"); *Francis I. duPont & Co. v. Universal City Studios, Inc.*, 312 A.2d 344, 348–49 (Del.Ch. 1973) ("Our cases have recognized that an appraiser, in certain circumstances, may justify adjusting earnings by eliminating 'unusual and isolated' items from reported earnings."), *aff'd, Universal City Studios*, 334 A.2d 216. *See generally* Shannon P. Pratt & Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 131–32 (5th ed.2008).

represents a change in business operations that a minority stockholder has no power to make.

"[F]air value" should be determined on the basis of future free cash flows associated with the going concern, including the agency costs inherent in the enterprise prior to the merger. This view comports with the well-established principle of Delaware law that minority shareholders have no legal right to demand that the controlling shareholder achieve—and that they be paid—the value that might be obtained in a hypothetical third-party sale.

*Fair Value of Cornfields, supra,* at 154. Because a reduction in R & D expense only could be made by a new controller of Hazelett Strip–Casting, adjustments to reflect those changes would generate a third-party sale value, not going concern value.

Meinhart's second rationale for his R & D adjustment is factually inaccurate. According to Meinhart, more R & D will lead to more sales that are not yet reflected on the income statement. But Hazelett Strip–Casting did not suddenly double down on developing an innovative new product that would sell like hot cakes (or iPads) a few years hence. R & D expense increased because the company changed how it categorized the salary and other costs associated with idle employees. I therefore will not make any adjustment to the R & D expense reflected on Hazelett Strip–Casting's income statement.

The next set of adjustments raises trickier issues. Meinhart deducted losses attributed to the company's "Marine Division" and the profits attributed to its "Beach and Boat Motel." Neither has anything to do with the company's core manufacturing operations; both appear to serve the recreational interests of Bill, David, and the Hazelett family. Whether to make normalizing adjustments for these operations, along with possible adjustments for Bill and David's compensation, cannot be answered simply by invoking the operative reality of the enterprise.

As a controller, Bill understandably tried to structure his family's relationships with Hazelett Strip–Casting to maximize the after-tax returns that the enterprise generated for them. Corporate owners face the problem of double taxation: a dollar of net income returned to the owner as a dividend is taxed twice, first as income to the corporation and again as income to the individual. To minimize the pain of double taxation, corporations like Hazelett Strip–Casting rationally find ways to provide returns for their owners in the form of compensation and perquisites. When a corporation has a minority owner, structuring returns in this fashion has the additional benefit of avoiding the need to pay dividends to the minority.

Hazelett Strip–Casting appears to have delivered tax-advantaged returns to Bill and the Hazelett family in at least three ways. First, it compensated Bill at a relatively high rate by paying him a "commission" set at a flat two percent of the company's top-line revenues. David had a similar arrangement. This practice resulted in Bill receiving average compensation of $421,822, during the period leading up to the January 2008 valuation date.[18] David received average compensation during the same period of $253,996.[19] By contrast, four of the company's five senior non-owner managers received average compensation during this period of less

---

18. Bill's compensation was $395,800 (2003), $500,400 (2004), $371,744 (2005), $368,892 (2006), $472,273 (2007).

19. David's compensation was $226,900 (2003), $268,600 (2004), $245,652 (2005), $239,529 (2006), $289,299 (2007).

than $100,000, and the fifth received average compensation of $100,796.60. The company's average (unadjusted) net income over this period was $166,200.[20] I believe that the compensation paid by the company to its five most senior professional managers more accurately reflected the employment market for small company executives in the Colchester, Vermont area, and some element of Bill and David's compensation comprised a return on the Hazelett family's ownership of the business.

Second, Hazelett Strip–Casting historically leased five machine tools from a limited liability company wholly owned by Bill. The aggregate lease payments were approximately $90,000 per year. I regard this as another way to provide Bill with a tax-advantaged return.

Third, Hazelett Strip–Casting maintained a "Marine Division" that has never turned a profit in twenty years. Between 2003 and 2008, the division consistently operated at a loss on the order of $100,000 per year. The company also owned and maintained the "Beach and Boat Motel," which occupied part of extensive frontage on Lake Champlain's Malletts Bay. Neither had any relationship to the company's manufacturing operations. The Marine Division and the motel provided a way for

Bill to support his sailing hobby and enjoy recreational opportunities.

In identifying these items, I do not mean to impugn the Hazelett family or imply that Hazelett Strip–Casting was doing anything illegal. No one likes to pay more taxes than they have to. But in terms of ensuring that minority stockholders receive their aliquot share of the going concern value of the firm, interested transactions of this type present difficulties. In a world where Bill was the sole owner of Hazelett Strip–Casting and did not face the problem of double taxation (or where dividends were taxed in the aggregate at a rate below Bill's individual tax rate), Bill and David could well have paid themselves compensation more closely resembling what they paid their professional managers, foregone Bill's equipment lease payment, and pursued their chosen hobbies outside of the firm. Each change would allow additional dollars to fall to the net income line, resulting in a higher and more accurate value for the firm's equity.

Delaware law on fair value addresses the resulting tension by empowering a court to make normalizing adjustments to account for expenses that reflect controller self-dealing when the plaintiff/petitioner provides an adequate evidentiary basis for the adjustment.[21] Most

---

**20.** The company's (unadjusted) net after-tax income was $18,000 (2003), a loss of $464,000 (2004), $1,791,000 (2005), a loss of $926,000 (2006), $412,000 (2007).

**21.** See Montgomery Cellular Hldg. Co. v. Dobler, 880 A.2d 206, 224–25 (Del.2005), aff'g in relevant part, Dobler v. Montgomery Cellular Hldg. Co., 2004 WL 2271592, at *7, *16–17 (Del.Ch. Sept. 30, 2004) (determining fair value after adjusting DCF projections to eliminate (i) management fees paid to parent company for which no justifying evidence had been presented, (ii) interest associated with unexplained intercompany loan to parent, (iii) unsupported allocation of corporate overhead from parent to subsidiary, and (iv) payments

made to parent under sale and leaseback transaction that the court regarded as "an inappropriate exaction by [the parent company] due to its corporate control"); Del. Open MRI, 898 A.2d at 321–24 (adjusting company's income to adjust for overpayment to controller for services, and incorporating that adjustment to DCF analysis); ONTI, Inc. v. Integra Bank, 751 A.2d 904, 917–18 (Del.Ch. 1999) (determining fair value using DCF analysis after adjusting projections to increase fees paid to corporation by affiliate of controller from 20% to 40%); Francis I. duPont & Co., 312 A.2d at 351 (determining fair value after adjusting distribution fee paid to controller from 30% to 12.5% because controller failed to prove that the actual distribution fee

pertinently, in *Radiology Associates*, the Court awarded fair value after adjusting the projected salaries to be paid to the controlling individuals who implemented the freeze-out merger to remove an amount deemed to constitute a return on equity rather than compensation. 611 A.2d at 490–91.

■ In the current case, I would be inclined to make a normalizing adjustment in each of the three areas identified above. The plaintiff, however, did not seek a normalizing adjustment for Bill or David's compensation or for Bill's equipment lease payments, and WMA declined to take a position on whether these were market-rate transactions.[22] By contrast, the plaintiff and WMA did advocate an adjustment for the Marine Division, which has never turned a profit. Notwithstanding Bill and David's avowed belief that someday one of Bill's marine inventions might be a commercial success, I find that the Marine Division was a tax-efficient way for Bill to indulge his love of sailing. I therefore adjust the company's historical figures to remove the expenses associated with the Marine Division. The Beach and Boat Motel has historically operated at a modest profit, and I will give the minority stockholders the benefit of those returns. This outcome forces the controller to bear the downside risk of his self-interested investment decision.

Finally, Meinhart deducted revenue resulting from non-recurring disposals of fixed assets and from the 2006 sale of real estate in which Hazelett Strip–Casting held an indirect 50% interest. These are standard and appropriate normalizing adjustments, which I adopt. For their part, the defendants have argued in post-trial briefing for an adjustment to account for the "above average normal field service revenues" in fiscal year 2007, which resulted from a major fire in a customer's plant. In responding to the plaintiff's interrogatories, the defendants identified this income as part of ordinary "year-to-year volatility in the Company's profitability," JX49 at 24, rather than as a "nonrecurring or extraordinary income or expense item[ ]," *id.* at 22. The defendants are bound by their response and cannot change positions after the close of discovery and the completion of trial. This argument was not fairly presented, and I deem it waived. *See, e.g., PNB Hldg. Co.*, 2006 WL 2403999, at *18.

Making the normalizing adjustments results in the earnings figures appearing in the table below. After-tax earnings are derived using the company's actual tax rate in fiscal years 2003 through 2007 and a normalized rate of 40% for 2003 and 2008:

was fair); *see also Hodas v. Spectrum Tech., Inc.*, 1992 WL 364682, at *4 (Del.Ch. Dec. 7, 1992) (considering whether to adjust compensation paid to controller as officer of the corporation for purposes of determining fair value but declining because of lack of evidence that the compensation was unreasonably high); *cf. Gonsalves*, 701 A.2d at 362–63 (affirming Court of Chancery's decision not to adjust allegedly excessive compensation paid to controller as CEO where evidence did not support adjustment); *Fair Value of Cornfields, supra*, at 160–61 (discussing principle and cases).

**22.** *See* JX37 at 21 ("[A]t the writing of this report, we were not in a position to state whether or not R. William Hazelett was being paid a market-rate of compensation for the services he provided to the Company. Consequently we did not make a normalization adjustment for the compensation paid to R. William Hazelett."); *id.* at 22 ("[A]t the writing of this report, we were not in a position to state whether or not the Company is paying a market-rate of rent for the use of the equipment. Consequently, we did not make a normalization adjustment for the related-party rental payments.").

| Period | Adjusted Pre–Tax Earnings ($000s) | Adjusted After–Tax Earnings ($000s) |
|---|---|---|
| Fiscal year ended 3/31/03 | 1 | 0 |
| Fiscal year ended 3/31/04 | (281) | (178) |
| Fiscal year ended 3/31/05 | 2,315 | 1,524 |
| Fiscal year ended 3/31/06 | (1,288) | (796) |
| Fiscal year ended 3/31/07 | 778 | 466 |
| Nine months ended 12/31/07 | 635 | 381 |
| Annualized fiscal 2008 | 847 | 508 |
| Six year average with annualized 2008 | 395.1 | 254.2 |
| Five year average excluding 2003 and with annualized 2008 | 474 | 305 |
| Six year average with double weighting for 2007 and annualized 2008 | 499 | 312 |

To reflect the improving earnings trend, SMK averaged what I have labeled the "six year average (with annualized 2008)" and the "six year average with double weighting for 2007 and annualized 2008." I adopt this approach, which yields an after-tax earnings projection of $283,327. Because I believe that at least some portion of Bill and David's compensation and Bill's equipment lease payments represent a return on their investment that should drop to the net income line, this estimate risks undervaluing the minority interest.

 The capitalized earnings method next requires a capitalization rate. *Gonsalves v. Straight Arrow Publishers Inc.*, 2002 WL 31057465, at *3 (Del.Ch. Sept. 10, 2002). A capitalization rate is often obtained "through a comparison with similar publicly traded companies whose market capitalization and earnings measures are publicly disclosed." *Id.* (internal quotation marks omitted). A price-to-earnings ("P/E") ratio derived from the P/E ratios of comparable companies is typically used. *Id.* After a base ratio has been selected, the court may adjust the resulting figure to reflect company-specific attributes. *E.g., Boyer,* 754 A.2d at 904–05 (discounting P/E multiple "[t]o account for the [subject company's] peculiar, nega-

tive characteristics"). The ultimate selection of an appropriate capitalization factor is entrusted to the discretion of the court, and there is no "hard and fast rule to govern [its] selection." *Del. Racing Ass'n,* 213 A.2d at 213. The selection of a proper multiplier

> necessitates not only the Court's examination of historical earnings, but also a perusal of the corporation's stability and future prospects.... The prospective financial condition of the subject corporation and the risk factor inherent in the corporation and the industry within which it operates are vital factors to be considered.... The multiplier will be low if the financial outlook for a corporation is poor, or high if the prospects are encouraging.

*Universal City Studios,* 334 A.2d at 218.

As discussed below, Hazelett Strip–Casting lacks publicly traded peer companies that are sufficiently comparable to be used reliably for valuation purposes. *See, infra,* Part III.D.3. A capitalization factor therefore cannot be derived from peer-company multiples. Both experts addressed this difficulty by deriving a discount factor for Hazelett Strip–Casting,

subtracting an anticipated growth rate, and using the inverse as the capitalization factor. *See* Pratt, *supra*, at 241.

■ Using the build-up method, SMK calculated a cost of equity of 21%. Also using the build-up method, WMA calculated a cost of equity of 18%. The build-up method is commonly employed by professional appraisers and has been used by this Court. *E.g., Del. Open MRI Radiology Associates, P.A. v. Kessler*, 2006 WL 4764042, at *33 (Del.Ch. April 26, 2006); *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *10 (Del.Ch. Oct. 28, 2005).

The build-up model begins with the core factors considered by CAPM, a risk-free rate and an equity premium rate. From there, however, the buildup model begins to diverge from CAPM. Under the build-up method, beta is not considered. A size premium, used consistently with the practice of most current users of CAPM in the appraisal and valuation context, is de rigueur under the build-up model. Much more heretical to CAPM, however, the build-up method typically incorporates heavy dollops of what is called "company-specific risk," the very sort of unsystematic risk that the CAPM believes is not rewarded by the capital markets and should not be considered in calculating a cost of capital. The calculation of a company specific risk is highly subjective and often is justified as a way of taking into account competitive and other factors that endanger the subject company's ability to achieve its projected cash flows. In other words, it is often a back-door method of reducing estimated cash flows rather than adjusting them directly. To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick.

*Del. Open MRI*, 2006 WL 4764042, at *33. SMK's build-up method included a healthy company-specific risk premium of 6%. WMA included a company-specific risk premium of 2%. If SMK had used WMA's company-specific risk premium, its cost of equity would have been 17%. Because of the dangers inherent in overestimating the company-specific risk premium, and because I believe the earnings figures underestimate the real economic returns that Hazelett Strip–Casting generates for its owners, I will replace SMK's 6% factor with WMA's 2%. This generates a cost of equity of 17%.

Before applying the inverse of the cost of equity as a capitalization factor, it is necessary to deduct a growth factor. Pratt, *supra*, at 241. SMK used a growth factor of 4.4%. WMA used a growth factor of 4%. Unlike WMA, SMK spoke directly with management and should have had a better handle on the company's growth. A higher growth factor generates a higher appraised value, giving SMK a reason to be conservative. I therefore adopt SMK's figure.

Subtracting the growth factor from the cost of equity produces a capitalization factor of 12.6%. Dividing the earnings base of $283,327 by this capitalization factor produces an equity value of $2,248,627 for the operating business.

■ The final step in the analysis is to add the value of non-operating assets. *See Radiology Assocs.*, 611 A.2d at 495. There are two. The first is real estate appraised at $951,000. Although both experts deducted the costs incurred in selling the properties and the taxes to be paid on the gain, Delaware law does not permit these deductions when valuing a corporation as a going concern. *See Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 552 (approving Court of Chancery's disallowance of sale expenses and reversing Court of Chan-

cery's deduction of capital gains taxes); *Berger v. Pubco Corp.*, 2010 WL 2025483, at *1 (Del.Ch. May 10, 2010) (following *Paskill* in refusing to deduct capital gains taxes). SMK then added an additional discount of 35%, opining that a buyer would negotiate a lower price because it might be a hassle to disentangle the non-operating parcels. A discount of this nature is contrary to Delaware law. *See Paskill,* 747 A.2d at 552, 554. I therefore add the full appraised value of the non-operating real estate.

The second asset is a net operating loss ("NOL") that can be used to offset the company's future earnings for tax purposes. *See Versata Enters. v. Selectica, Inc.,* 5 A.3d 586, 589 (Del.2010). Hazelett Strip–Casting has a history of generating taxable earnings, and the capitalized earnings valuation anticipates that it will continuing doing so in a manner that will enable the Hazelett family to take advantage of the NOL. I therefore add $258,000, representing the full value of the NOL as valued by WMA. The plaintiff has not asked me to include an additional $244,000 in research and other tax credits that could be available to reduce federal income taxes further.

Meinhart argued for a third adjustment to reflect the $558,309.50 that the company paid to the Estate as a result of the reverse split. If this amount had represented cash in excess of what was required for the company's operations, then I would agree and add it to the capitalized earnings valuation. *Radiology Assocs.,* 611 A.2d at 496–96; *see also* Pratt, *supra,* at 299. But Hazelett Strip–Casting did not have excess cash to make this payment. The company drew on its line of credit.

Meinhart is correct that Hazelett Strip–Casting should be valued as if the reverse split had not occurred and thus as if the payment never had been made. If I had

the information, I would have made an additional normalizing adjustment to the earnings base to back out the debt payments associated with the incremental borrowings of $558,309.50. That information is not in the record, and I cannot make the adjustment.

The sum of the capitalized earnings valuation ($2,248,627) plus the real estate ($951,000) plus the NOL ($258,000) produces an aggregate value of $3,457,627.

### 2. Book Value

■ Book value can be an appropriate valuation method for a business that derives significant value from its physical assets. *In re Sunbelt Beverage Corp. S'holder Litig.,* 2010 WL 26539, at *8 n. 23 (Del.Ch. Jan. 5, 2010) (observing that "valuation driven by book value" is "arguably justif[ied]" for companies that derive substantial value "from the use and maintenance of their physical assets"); *see, e.g., Levin v. Midland–Ross Cop.,* 41 Del.Ch. 276, 194 A.2d 50, 54 (1963) (employing book value). Book value tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations. *See TV58 Ltd. P'ship v. Weigel Broad. Co.,* 1993 WL 285850, at *3 (Del.Ch. July 22, 1993); *Levin,* 194 A.2d at 55; Pratt, *supra,* at 350–51. At least where a company accounts for its assets at the lower of historical cost or market value, book value will tend to provide a conservative estimate that can be useful as one indicator of value even for companies not in stereotypically asset-focused industries like coal or steel. *See Kahn v. Household Acq. Corp.,* 591 A.2d 166, 174–75 (Del.1991) (affirming Court of Chancery's use of book value as one indicator of fair value for an airline); *Pinson v. Campbell–Taggart, Inc.,* 1989 WL 17438, at *16 (Del.Ch. Feb. 28, 1989) (valuing food products company based on

"formula" which gave 75% weight to "earnings value" and 25% weight to "book value").

As of December 31, 2007, Hazelett Strip–Casting's books reflected owner's equity of $7,718,469, a figure that remained relatively stable during the five years leading up to the valuation date. Hazelett Strip–Casting owns significant assets. The company values its assets at the lower of cost or market, and its accountants regularly review the values that management places on its assets and have never questioned them or concluded that the value of an asset was impaired. As of December 31, 2007, Hazelett Strip–Casting carried its spare parts inventory on its books at $7,660,710, nearly matching total owner's equity, and representing 57.8% of its current assets and 35.2% of total assets (including other assets and fixed assets net of accumulated depreciation). The company also owns heavy industrial manufacturing equipment for the manufacture of casting machines and spare parts.

Despite recognizing that the cost or asset-based approach is one standard valuation method and that it typically "establishes a 'floor value' of the business," SMK declined to consider book value. JX36 at 26. Wright could not credibly explain why the SMK valuation generated such a significant discount to book value.

### 3. WMA's Comparable Companies Analysis

█ WMA prepared a comparable company analysis. Although Meinhart plausibly explained why he chose his three guideline companies, I am not convinced that they are sufficiently comparable for reliable use. See Prescott Small Cap, L.P. v. Coleman Co., 2004 WL 2059515, at *21–23 (Del.Ch. Sept. 8, 2004) (rejecting comparable company analysis where "none of [the defendant's expert's] 'comparables'

was truly comparable to [the subject company] in any meaningful sense, and none of them had economics similar to [the subject company's]"). "The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison." Radiology Assocs., 611 A.2d at 490. While appropriate adjustments can account for some differences, "[a]t some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." Id.

The companies Meinhart selected are much bigger than Hazelett Strip–Casting, have more diversified customer bases, enjoy better access to capital, and have deeper management teams. The selected companies primarily generate revenue from new machine sales and only secondarily from spare parts. The situation is reversed for Hazelett Strip–Casting. The underlying economics driving the selected companies appear different from those driving Hazelett Strip–Casting. Cf. Pratt, supra, at 269. The selected companies have stable earnings and have achieved consistent growth over the past five years. During the same period, Hazelett Strip–Casting's earnings have been erratic, and the company has suffered losses. I lack sufficient confidence in the comparability of the selected companies to use the comparable company method, even with adjustments to reflect their differences from Hazelett Strip–Casting.

### 4. WMA's Capitalized Free Cash Flow Analysis

WMA also prepared a capitalized free cash flow analysis. The steps in this method parallel the capitalized earnings method except that it capitalizes free cash flow instead of earnings. The free cash flow method does no better than the

earnings method in accounting for controller self-dealing because the single-period estimate of future cash flow incorporates payments to insiders, just like the single-period earnings estimate. Both methods require normalizing adjustments.

Using WMA's capitalized free cash flow analysis would require significant adjustments to produce a reliable going concern value. For example, WMA used only an average of two recent periods (fiscal 2007 and annualized 2008) to derive its free cash flow projection. This selection does not sufficiently take into account the company's fluctuating performance, and I would need to develop my own estimate. Because the capitalized free cash flow method appears redundant on these facts, I decline to undertake the exercise of modifying WMA's work.

### 5. The Fair Value Award

■ The capitalized earnings method produces an aggregate equity value of $3,457,627. Hazelett Strip–Casting's books reflect owner's equity of $7,718,469. The wide disparity remains troubling and reinforces my concern that the company's earnings have been depressed because the owners have taken their returns in the form of compensation and equipment lease payments, thereby suppressing an income-based valuation. To counter this, I value Hazelett Strip–Casting using a blended average that affords 80% weight to capitalized earnings value and 20% weight to book value. Before doing so, I add $558,309.50 to the book value to account for the payment to the Estate; if this amount had not been pre-paid, it would have been reflected in book value. The resulting fair value of equity is $4,421,457. Dividing by 1,150 yields a fair value per fractional interest of $3,845.

### E. The Defendants' "Hail Mary" Arguments

The defendants made two additional arguments, each akin to a last-second "Hail Mary" pass. Neither connects.

■ First, the defendants claim they did not owe fiduciary duties to Reis or the other beneficiaries of the Estate because at the time of the reverse split, those individuals were not yet stockholders. This argument fails because a plaintiff who has been bequeathed shares in a corporation is an "equitable owner" to whom fiduciary duties are owed and who has standing to sue for breach of fiduciary duty directly or derivatively. *See Jones v. Taylor*, 348 A.2d 188, 190–92 (Del.Ch.1975). *See generally Chase Nat'l Bank of N.Y. v. Sayles*, 11 F.2d 948, 952–53 (1st Cir.1926) ("[T]he interest of a pecuniary legatee is an equitable interest in property. . . ."); 6 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 59.2, at 427 (rev. ed. 2005) ("The title in the executor . . . is a mere legal title for purposes of administration, and the beneficiary has an inchoate or equitable interest.").

■ The defendants' cases deal with the very different situation of option and warrant holders. *See Corporate Prop. Assocs. 14, Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *4 & nn. 27–33 (Del.Ch. Apr. 10, 2008); *Feldman v. Cutaia*, 2006 WL 920420, at *6 n. 37 (Del.Ch. Apr. 5, 2006). Until the warrant or option is exercised, the underlying shares are not issued, and the warrant or option holder's rights are entirely contractual. *See Corporate Prop. Assocs.*, 2008 WL 963048, at *4; *Feldman*, 2006 WL 920420, at *6 n. 37. At the time the defendants acted, the minority shares were issued, outstanding, and held by the Estate. The defendants owed fiduciary duties to the equitable holders of the minority shares, and the claim for

breach of those duties transferred by operation of law to Reis and the other legatees.

Second, the defendants argue that Reis is estopped from challenging the reverse split because she initially supported the idea as a way to get cash for the legatees. The defendants draw an analogy to the principle that stockholders who vote in favor of a merger historically were subject to a waiver defense. *See Household Acq.*, 591 A.2d at 176–77. The waiver principles relied on in *Household* subsequently have been held not to apply to a controlling stockholder freeze-out. *In re JCC Hldg. Co.*, 843 A.2d 713, 722–25 (Del.Ch.2003). Moreover, the shareholders who were estopped from challenging the merger in *Household* voted their shares in favor of a specific transaction at a specific price. 591 A.2d at 169. Reis only indicated support for a mechanism by which Dick's beneficiaries could receive cash. She supported a concept. She never endorsed a price. Estoppel is not a defense.

## F. The Remedy

I have determined that the fair value of each fractional interest was $3,845. The defendants were bequeathed 20 pre-reverse-split shares, leaving 330 for Reis and the other beneficiaries. Multiplying by 330 produces a damages award of $1,268,850.

The defendants purported to implement the reverse split as of December 23, 2005, and asserted that the minority shares were no longer outstanding as of that date. On March 20, 2006, they paid the Estate $558,309.50 as compensation. By doing so, the defendants pre-paid a portion of what they now owe. They are entitled to an offset equal to $526,406.10, the amount paid for 330 shares, plus (i) the interest actually earned on that amount while the funds were in escrow plus (ii) interest at the legal rate, compounded quarterly, from the date the amount was distributed to the beneficiaries through January 28, 2008. This total will be subtracted from the fair value award of $1,268,850. The defendants owe the net amount plus pre- and post-judgment interest on the net amount from January 28, 2008, forward. Interest will be calculated at the legal rate, compounded quarterly, until the date the judgment is paid, with the legal rate resetting with changes in the underlying federal discount rate. *See* 6 *Del. C.* § 2301; 8 *Del. C.* § 262(h).

Ordinarily, the existence of a Section 102(b)(7) provision would compel a director-by-director analysis to determine which defendants are personally liable. *See, e.g., Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del.Ch. June 3, 2008). The defendants have not made a Section 102(b)(7) argument, the full charter is not in the record, and I must assume that Hazelett Strip–Casting lacks a Section 102(b)(7) provision. Accordingly, the defendants are jointly and severally liable for the remedy imposed.

## III. CONCLUSION

For the foregoing reasons, I will enter a final judgment against the defendants in the amount of $1,268,850, less the offset, plus pre- and post-judgment interest. The plaintiff is awarded costs. The parties will confer and submit an implementing form of order.